(No. 80124.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT TODD, Appellant.

*Opinion filed September 25, 1997.—Rehearing denied December 1, 1997.*

302

John Paul Carroll & Associates, of Naperville, Paul B. Vanni, of Carbondale, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield

(Barbara E. Preiner, Solicitor General, and Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Robert Todd, brings this appeal from an order of the circuit court of Clinton County denying his amended petition for post-conviction relief. Because the defendant received the death sentence for the underlying first degree murder conviction, the present appeal lies directly to this court. 134 Ill. 2d R. 651(a).

Following a bench trial in the circuit court of Clinton County, the defendant was convicted of the first degree murder and attempted aggravated criminal sexual assault of Sandy Shelton. The trial judge, in a bench proceeding, sentenced the defendant to death for the first degree murder conviction. On appeal, this court affirmed the defendant's convictions and death sentence. *People v. Todd*, 154 Ill. 2d 57 (1992). The United States Supreme Court denied the defendant's petition for a writ of *certiorari. Todd v. Illinois*, 510 U.S. 944, 126 L. Ed. 2d 331, 114 S. Ct. 381 (1993).

The defendant instituted the present action on May 2, 1994, by filing a *pro se* petition for post-conviction relief in the circuit court of Clinton County. Counsel was later appointed to assist the defendant, and the defendant subsequently filed an amended post-conviction petition, raising a number of allegations of constitutional error in the original proceedings. The State moved to dismiss the petition without an evidentiary hearing. The circuit judge granted the defendant an evidentiary hearing on two of the issues raised in the amended post-conviction petition; the judge believed that the remain-

ing claims either were waived or had been determined by this court on direct appeal. Following the evidentiary hearing, the circuit judge denied the defendant's amended petition. For the reasons set forth below, we affirm the judgment of the circuit court.

The evidence of the defendant's offenses was described in our opinion on direct appeal, and only a brief summary of the trial testimony is necessary here. The defendant and the victim were seen together at two bars, one in Carlyle and one in Beckemeyer, late on July 11, 1989, and early the following morning. At the second bar, in Beckemeyer, a bartender provided the defendant with a marker so that he could write on the wall, a practice customers were encouraged to take part in. There, the victim purchased a six-pack of beer, and she and the defendant then left together.

Scott Nielson, who had been a cellmate with the defendant in the Clinton County jail, testified to a statement made to him by the defendant about the present offenses. According to Nielson, the defendant said that he met a woman in a bar, where they had a beer, and that they then went to another bar, where they danced and had a couple of drinks. The defendant signed his name under the woman's name on the wall of one of the bars. They later bought some beer and went to the woman's house, in Beckemeyer. The defendant told Nielson that the woman put a Bob Seger tape in a tape player. After the two drank for awhile, the defendant made advances toward the woman, and she rebuffed him. The defendant then got up, used the bathroom, and got another can of beer from the kitchen. The defendant returned and made more overtures, which the woman again declined, pushing him away. According to Nielson, the defendant said that he then slapped the

woman and blacked out. His next memory was of being at a convenience store later that morning.

Two persons saw the defendant's car between 2:30 and 3 a.m. on July 12 at the building in Carlyle where the defendant was renting an apartment. The car drove up to the building quickly, went over the curb, and stopped on the grass. The driver, whom the witnesses were unable to identify, made several trips inside the building, returning to his car with armloads of things, and then drove off.

Other testimony showed that the Pana police department received a telephone call at 8:25 a.m. on July 12 reporting that a woman who drove a Cordoba automobile had been murdered in Beckemeyer. An employee at a convenience store in Pana testified that the defendant came into the store around 8:15 and asked for change so that he could make a telephone call. A pay phone was located outside the store, and the police station was across the street.

The victim's daughter discovered her mother's body around 11 a.m. on July 12. The victim was lying on the floor and was naked. A shirt was wrapped tightly around her neck. The victim's daughter noticed a strong odor of natural gas, and found that the burners on the gas stove were turned on. Candles were burning in several rooms of the house. The cause of the victim's death was later determined to be strangulation; she had also been stabbed five times in the side. Vegetable oil had been spread on the victim, and drops of wax had been placed over that. One hundred dollars in cash was found in the pocket of the victim's jeans, which were lying near her body. Tests for the presence of semen and sperm were negative. In addition, a number of hairs were found on the victim, but none of them could be linked to the de-

fendant; most of the hairs were from the victim herself. Other forensic testimony, however, established that the defendant's fingerprint and bare footprint and several shoeprints were found in the victim's house. Also, wax consistent with that found on the victim's body was discovered in the defendant's shower. In addition, a Bob Seger tape was later found in the victim's tape player, corroborating Nielson's account of the defendant's statement to him. The defendant's name was found under the victim's name on the wall of the bar where the defendant had requested a marker and where the defendant and the victim had been seen together. Also, the victim drove a Cordoba, as the caller to the Pana police department had stated. At the conclusion of the trial, the judge found the defendant guilty of first degree murder and attempted aggravated criminal sexual assault.

A capital sentencing hearing was subsequently conducted. At the hearing, the State established the defendant's eligibility for the death penalty on the basis of two aggravating circumstances: first degree murder in the course of robbery, and first degree murder in the course of attempted aggravated criminal sexual assault. At the second stage of the sentencing hearing, the State presented aggravating evidence from several witnesses. The defendant's former wife testified that the defendant had a bad temper and was occasionally violent. A former employer testified that the defendant was fired from his job at a facility for mentally retarded persons because he had used excessive force with two patients. A young woman described her encounter with the defendant a day before the offenses, when the defendant, whom she had not previously met, stopped to help her with her car and then attempted to touch and kiss her. The woman also testified that she declined the defendant's invitation to go to his apartment. The defense presented mitigating testimony from a number of the

defendant's family members and friends. We will discuss the evidence introduced at the sentencing hearing in greater detail later in this opinion.

## I

The Post-Conviction Hearing Act (725 ILCS 5/122—1 through 122—7 (West 1994)) permits an offender to challenge a conviction or sentence for violations of federal or state constitutional rights. *People v. Sanchez*, 169 Ill. 2d 472, 480 (1996); *People v. Thompkins*, 161 Ill. 2d 148, 157 (1994). An action for post-conviction relief is a collateral proceeding, not an appeal from the underlying criminal judgment. *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995); *People v. Free*, 122 Ill. 2d 367, 377 (1988). "The function of a post-conviction proceeding is not to relitigate the defendant's guilt or innocence but to determine whether he was denied constitutional rights. [Citation.]" *People v. Shaw*, 49 Ill. 2d 309, 311 (1971). To obtain post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment being challenged. 725 ILCS 5/122—1 (West 1994); *People v. Guest*, 166 Ill. 2d 381, 389 (1995). Considerations of *res judicata* and waiver limit the scope of post-conviction review "to constitutional matters which have not been, and could not have been, previously adjudicated." *People v. Winsett*, 153 Ill. 2d 335, 346 (1992). Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised in the earlier proceedings, but were not, will normally be deemed waived. *People v. Coleman*, 168 Ill. 2d 509, 522 (1995); *People v. Ruiz*, 132 Ill. 2d 1, 9 (1989). Principles of fundamental fairness, however, will support relaxation of the *res judicata* and waiver doctrines when appropriate. *People v. Neal*, 142 Ill. 2d 140, 146 (1990). With these considerations in mind, we now turn to the

issues raised by the defendant in this appeal from the circuit court's denial of post-conviction relief.

The defendant first argues that trial counsel was ineffective for giving him incorrect advice about waiving a jury for trial and sentencing. In the proceedings below, the circuit judge rejected these claims after an evidentiary hearing. At the hearing, the parties presented conflicting evidence on this portion of the defendant's post-conviction petition. The defendant testified that on May 9, 1990, he was summoned to the Clinton County jail from the Washington County jail, in Nashville, where he had been staying. Early that afternoon, he met with his attorney, Maurice Killion, in a judge's chambers in the Clinton County courthouse. The defendant said that the meeting was brief, lasting only a minute to a minute and a half. According to the defendant, Killion said that the defendant would have to testify if he chose a jury trial, and that he should waive a jury because counsel had not been allowed sufficient time to prepare for a jury trial and because a jury would not believe Killion, for he was black. In addition, Killion said that the defendant would receive a sentence of 35 years' imprisonment if he agreed to waive a jury but that he would be executed within 30 days if a jury found him guilty.

The defense presented other witnesses at the evidentiary hearing who described the defendant's preparations for a jury trial. A minister who had regularly visited the defendant in jail said that he gave the defendant a haircut on the morning of May 9, 1990, the day when the waivers were accepted, and that the defendant did not say then that he would not have a jury trial. The defendant's mother, Sally Todd, who visited the defendant frequently while he was in jail awaiting trial, testified that he never said, prior to May 9, that he was going to waive a jury.

The defendant's trial attorney, Maurice Killion, testified at the evidentiary hearing that he and the defendant discussed the jury waivers a number of times prior to May 9, 1990, the day when the waivers were executed. According to Killion, he met with the defendant in a judge's chambers in the courthouse for an hour to an hour and a half early in the afternoon of May 9. Killion testified that he recommended that the defendant waive a jury because a jury would want to hear the defendant testify, yet the defendant was reluctant to do so; because photographs from the crime scene were gruesome and would be upsetting to jurors; and because the trial judge might be lenient in the wake of a jury waiver. Killion denied telling the defendant to waive a jury for any of the reasons mentioned by the defendant in his testimony at the evidentiary hearing. Killion was impeached at the hearing with his testimony from a deposition, in which he said repeatedly that he was unable to remember what he and the defendant had discussed regarding the jury waiver. At the post-conviction hearing, Killion explained that he was deposed after only several hours' sleep the night before and that he had not known in advance what particular aspects of the case would be the focus of the deposition.

Assistant State's Attorney Robert Matoush testified at the evidentiary hearing that on May 9, 1990, Killion and the defendant met together in a room in the courthouse for one or two hours and that the defendant entered his jury waivers later that afternoon. Matoush denied that the defendant was ever offered a 35-year prison term in exchange for the jury waivers. According to Matoush, the prosecution offered only to forgo seeking the death penalty if the defendant pleaded guilty to first degree murder.

At the conclusion of the evidentiary hearing, the judge rejected the defendant's challenge to the jury

waivers. The judge concluded that the defendant and trial counsel were together for a period of time considerably longer than the brief period alleged by the defendant. The judge believed that the oral admonitions given to the defendant at the time of the jury waivers were thorough, and the judge found nothing in the record to show a lack of knowledge or an absence of voluntariness on the part of the defendant in making the waivers. The judge also noted that the defendant did not voice any complaints at the sentencing hearing, notwithstanding his assertion that he had been promised a 35-year sentence. The judge also believed that trial counsel's reasons for preferring a bench trial were not unreasonable, and the judge found that it was not surprising that Killion's recollection would have improved with the passage of time, and through subsequent efforts at recalling these events.

A defendant's right to a jury at trial is guaranteed by both the federal and state constitutions (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13); the right to a jury at a capital sentencing hearing is statutory in origin (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(d); *People v. Maxwell*, 148 Ill. 2d 116, 142 (1992); *People v. Erickson*, 117 Ill. 2d 271, 289 (1987)). Waiver of either right must be knowing, intelligent, and voluntary. *People v. Strickland*, 154 Ill. 2d 489, 517 (1992); *People v. Buggs*, 112 Ill. 2d 284, 292-93 (1986); *People v. Albanese*, 104 Ill. 2d 504, 534-36 (1984). There is no prescribed formula that must be used by a judge before accepting a defendant's jury waiver, whether for trial (*People v. Smith*, 106 Ill. 2d 327, 334 (1985); *People v. Frey*, 103 Ill. 2d 327, 332 (1984)) or for a death penalty hearing (*Buggs*, 112 Ill. 2d at 292; *Albanese*, 104 Ill. 2d at 535-36).

The judge hearing the defendant's post-conviction petition rejected the defendant's allegations that he was improperly induced to waive juries for both trial and

sentencing. This finding is not against the manifest weight of the evidence. The post-conviction judge found that the meeting between the defendant and trial counsel on May 9, prior to the jury waivers, lasted considerably longer than the brief period claimed by the defendant. In addition, the judge found that trial counsel's reasons for recommending the jury waivers were not unreasonable.

Any doubt whether the defendant's jury waivers were knowing and voluntary is dispelled by a consideration of the admonitions given to the defendant by the judge who accepted the waivers. On direct appeal, this court rejected two challenges to the comprehensiveness of the admonitions used to advise the defendant of his right to a jury for the capital sentencing hearing. *People v. Todd*, 154 Ill. 2d 57, 72 (1992). The lengthy series of admonitions is reproduced below:

> "THE COURT: Mr. Todd, I have been handed a document entitled Waiver of Jury and where you waive your right to trial by jury in each of the 5 Bills of Indictment and consent to then a trial by the Court. Appears to be signed by Robert B. Todd. Did you sign this here today?
>
> ROBERT TODD, DEFENDANT: Yes, sir.
>
> THE COURT: Any threats or use of force used against you to get you to sign this?
>
> ROBERT TODD, DEFENDANT: No, sir.
>
> THE COURT: Any promises made to you to get you to sign this?
>
> ROBERT TODD, DEFENDANT: No, sir.
>
> THE COURT: You understand what this is doing?
>
> ROBERT TODD, DEFENDANT: Yes, sir.
>
> THE COURT: What you were doing before with the jury trial, the State had to convince 12 people beyond a reasonable doubt that you were guilty of the charges, and now all they have got to do is convince the Judge. Do you understand that?
>
> ROBERT TODD, DEFENDANT: Yes, sir.
>
> THE COURT: That's what you want to do?
>
> ROBERT TODD, DEFENDANT: Yes, sir.

314

THE COURT: Let the record show the Defendant knowingly and voluntarily waives trial by jury. Need to contact Judge Huber as to date for Bench Trial?

MR. MIDDENDORF [State's Attorney]: Your honor, we are assuming, at this point, that the trial would remain set for the 14th of May. I will contact Judge Huber today with Mr. Killion [defense counsel] and see whether or not Judge Huber elects to make any changes.

THE COURT: I will just set it for Bench Trial then at this time for May 14th. So your case will be set for trial before the Court on May 14th at 9 o'clock a.m. Mr. Todd, I have been provided with a document entitled Waiver of Trial by Jury for Sentencing Hearing. This appears to bear the signature of Robert Todd. Did you sign this document?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: Any threats or use of force used against you to get you to sign this?

ROBERT TODD, DEFENDANT: No, sir.

THE COURT: Any promises made to you?

ROBERT TODD, DEFENDANT: No, sir.

THE COURT: I am going to ask you again back on the waiver of the trial, the jury trial and as far as this waiver, did you execute these after fully consulting with your lawyer?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: You understand, that the—I indicated the State is requesting the death penalty be imposed in this case?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: And so you are entitled to a jury on that, and there would have to be unanimous finding. All 12 would have to find that one of the factors existed is the factor [sic]. Basically the State's proceeding on that. There was another felony involved?

MR. MIDDENDORF: Yes, sir. There have been 2 separate theories proposed. One is that the crime of Attempt Criminal Sexual Assault and the other being—excuse me, of Robbery. Charged in separate counts of the Indictment.

THE COURT: So they would have to present that and have a unanimous finding of those 12 jurors of one of—

one or more of those factors existed. Now then, without a jury it will just be up to a judge to decide that. You understand that?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: And then if that jury unanimously found that some of those factors existed, then they would consider matters in aggravation and mitigation which would be prior history, significant history of prior criminal activity. This is in mitigation, in your favor. Murder was committed when you were under the influence of extreme mental or emotional disturbance. Murdered individual was participant in homicidal conduct, consented to it. That you acted on compulsion or threat of menace or imminent infliction of death or great bodily harm. That you were not personally present during commission of the act or acts that caused the death. So now, in connection with those factors, they would have to again unanimously decide to impose the death penalty. So here you'd have 12 people that they have all got to agree on, and you are giving up that. Do you understand that?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: So basically, then it's your desire that just one person, a judge, decides your guilt or innocence. One person, just one judge decides whether or not the factors, aggravating factors, exist such that the death penalty could be imposed? If that's so found, then only one person, just one judge, would decide whether or not there were any mitigating factors or whether the death sentence could be imposed. So just one person is going to decide your entire facts. Do you understand?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: As opposed to 12. Do you understand that?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: You have no questions at all?

ROBERT TODD, DEFENDANT: No, sir.

THE COURT: No qualms or hesitations?

ROBERT TODD, DEFENDANT: No, sir.

THE COURT: You are telling the Court today this is what you freely and voluntarily—this is what you want to do?

ROBERT TODD, DEFENDANT: Yes, sir.

THE COURT: You don't need any more time to talk with your lawyer?

ROBERT TODD, DEFENDANT: No, sir.

THE COURT: Very well. Let the record further show that the Defendant, after being interrogated, knowingly and voluntarily executes a Waiver of Trial by Jury for the Sentencing Hearing. Such a waiver will be so entered. Do you have any questions at all?

ROBERT TODD, DEFENDANT: No, sir."

We believe that the preceding admonitions were sufficient to insure that the defendant's jury waivers were knowing, intelligent, and voluntary. Notably, in responding to the judge's questions, the defendant at no time referred to the promise of a 35-year sentence, the threat that he would have to testify if he elected to be tried and sentenced by a jury, or the other comments allegedly made by trial counsel to induce him to waive juries for trial and sentencing. The judge below rejected the defendant's allegations, and we conclude that defense counsel was not ineffective in his representation of the defendant regarding this aspect of the proceedings.

The defendant next challenges a provision in the form he used to waive a jury for sentencing. Paragraph nine of the waiver form stated:

"My attorney has explained to me, and I fully understand, that if the court accepts my waiver of jury trial for sentencing, that I cannot thereafter at any time, change my mind, and I will be forever barred from requesting that a jury determine sentencing in this case if I am convicted of the offense of first degree murder."

The defendant argues that the preceding paragraph incorrectly suggested that his decision to waive a jury would be irrevocable. We note that a defendant entering a jury waiver may later file a motion seeking to withdraw the waiver; the decision whether to grant or deny the motion is generally reserved to the trial court's discretion. *People v. Hall*, 114 Ill. 2d 376, 414 (1986).

Trial counsel had prepared the waiver form used in this case, and the defendant contends that trial counsel rendered ineffective assistance by including the provision in the form.

The State responds that this particular attack on the jury waiver comes too late because the issue is apparent from the record and could have been raised by the defendant on appeal from his convictions and sentence. On direct appeal, the defendant did raise two challenges to the comprehensiveness of the admonitions given to him prior to his waiver of a sentencing jury. As we have stated, this court rejected the defendant's arguments, finding no error in the court's admonitions to the defendant. *People v. Todd*, 154 Ill. 2d 57, 72 (1992). Clearly, the defendant at that time could have also challenged the presence of paragraph nine in the waiver form, which was a part of the record in the case. The defendant makes the additional argument, however, that appellate counsel was ineffective for failing to challenge on direct appeal the competency of trial counsel. Because this is the defendant's first opportunity to challenge appellate counsel's performance, we find it necessary to address the merits of this issue. See *People v. Tenner*, 175 Ill. 2d 372, 386 (1997).

We do not believe that the infirmity alleged in paragraph nine denied the defendant his right to competent counsel. The constitutional guarantee to the assistance of counsel (U.S. Const., amends. VI, XIV) encompasses the right to the effective assistance of counsel (*Cuyler v. Sullivan*, 446 U.S. 335, 344, 64 L. Ed. 2d 333, 343-44, 100 S. Ct. 1708, 1716 (1980)), both at trial and on a first appeal as of right (*Evitts v. Lucey*, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985). In *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1986), the Supreme Court articulated a two-part test for resolving claims of inef-

fective assistance of counsel. To prevail on a claim of ineffective assistance, a defendant must establish both that counsel's performance was deficient and that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To demonstrate prejudice resulting from an asserted deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Assuming that trial counsel was deficient for including this provision in the jury waiver, the relevant question under the prejudice component of the *Strickland* standard is "whether there exists a reasonable likelihood that the defendant would not have waived his jury right in the absence of the alleged error." *People v. Maxwell*, 148 Ill. 2d 116, 142 (1992). We conclude that inclusion of the challenged paragraph could not have affected the defendant's election to waive a sentencing jury in this case. It must be recognized that the provision in paragraph nine would have advised the reader that the consequences of a jury waiver were more onerous than they actually are. By suggesting that withdrawal of the waiver was always and forever barred, paragraph nine of the form imposed a disincentive to the decision to surrender the right to a jury. Thus, if the provision had had any effect on the reader, it would have been to make waiver of the right less likely, not more likely. The defendant, however, persisted in his desire to waive a jury for sentencing, even in the face of the statement that his decision would be irrevocable. Given these circumstances, we must therefore conclude that paragraph nine of the waiver form did not affect

the defendant's decision to give up the right to a jury, and this claim of ineffective assistance must therefore fail.

The defendant also briefly argues that the written waiver was defective because it did not specifically refer to the eligibility stage of the sentencing hearing. The defendant notes that trial counsel in his deposition and at the hearing was somewhat vague about when that stage occurred, at one point saying that it was when the grand jury indicted the defendant for a capital offense; counsel also correctly stated that it occurred after a finding of guilt in a capital case. Although this issue could have been raised on direct appeal, we will consider the claim on its merits, for the defendant makes the additional assertion that appellate counsel was ineffective for failing to challenge trial counsel's representation. We do not believe that the written waiver was required to mention specifically the eligibility stage of the sentencing hearing. We note that the death penalty statute refers to the waiver of a jury for the separate sentencing proceeding, without speaking of separate waivers for the two stages of the hearing. See Ill. Rev. Stat. 1989, ch. 38, par. 9—1(d). The admonitions provided by the judge who accepted the defendant's waivers sufficiently explained the process of capital sentencing, and we find no infirmity in the waiver on this ground.

The defendant, in his final argument pertaining to the jury waiver, contends that he later informed counsel that he wanted to withdraw the waivers but that his attorney refused to do so, telling him that the waivers were irrevocable. The defendant contends that counsel was ineffective for giving him that advice. The sole reason assigned by the defendant for his desire to withdraw the waivers is that he did not trust the trial judge in this case. The defendant's statement was contradicted by trial counsel, who, at the hearing on the post-

conviction petition, denied that the defendant sought to withdraw the jury waivers. Killion further testified that if the defendant had asked him to withdraw the jury waivers, he would have filed a motion to do so. In denying the defendant's post-conviction petition, the judge below did not specifically address this contention, though apparently he rejected the defendant's testimony on this point.

Assuming that the defendant wished to withdraw the jury waivers, we do not consider it likely that the trial judge would have granted the motion. "The question of whether a jury waiver may be withdrawn rests within the discretion of the trial court unless the circumstances indicate the defendant was unaware of the consequences of the waiver." *People v. Hall*, 114 Ill. 2d 376, 414 (1986). The only reason assigned for the defendant's change of heart is his assertion that he did not trust the trial judge. We agree with the State that it is unlikely that the trial judge would have allowed a motion to withdraw the waiver on that ground. Counsel's failure to file the requisite motion therefore could not have been prejudicial to the defendant, and we must therefore reject the defendant's contention that trial counsel was ineffective for not moving to withdraw the jury waivers.

## II

The defendant next argues that trial counsel was ineffective for not investigating and presenting additional mitigating evidence that was available at the time of the sentencing hearing. In support of this contention the defendant submitted, as part of his amended post-conviction petition, a report from a psychologist who had examined the defendant, a report from a mitigation specialist who had conducted an investigation into the defendant's personal history, and affidavits from some 28 family members, neighbors, and friends offer-

ing mitigating evidence. Both the psychologist and the mitigation specialist testified at the post-conviction hearing below. Before addressing the merits of this contention, we will review the evidence presented by defense counsel at the capital sentencing hearing and the evidence now offered by the defendant in support of his ineffective-assistance claim.

At the defendant's capital sentencing hearing, defense counsel introduced mitigating testimony from a variety of witnesses. A mitigation specialist, Arlene Messner Peters, had conducted an investigation of the defendant's personal history, and she testified at the sentencing hearing, summarizing her findings. Also, her report on the defendant was admitted into evidence. At the sentencing hearing, Peters testified that the defendant's mother was a strict disciplinarian and would often strike the defendant. On one occasion, she threw a knife at the defendant but missed him, hitting an aquarium instead. On several occasions, the mother would become angry if the defendant and his two younger sisters had not cleaned up dirty dishes by the time she returned home; their mother would then throw the food and dishes on the floor and order the children to clean up the mess. The defendant stuttered as a young child and was often picked on by other children as a result. He also did poorly in school. The family's house was small and cramped, and the defendant's sleeping area was in the kitchen. The defendant was particularly close to his sister Laurie, who is several years younger than the defendant.

Messner further related that, after graduating from high school, the defendant attended a Bible college for a year and worked in a variety of jobs. Later, he joined the army, serving for $1^1/_2$ years. Around this time, the defendant was using drugs heavily. He later stopped using drugs. The defendant had no prior criminal record,

and he was not a problem while incarcerated for the offenses here.

The defendant's mother also testified at the sentencing hearing. She described, among other incidents in the defendant's life, three suicide attempts by the defendant, beginning when he was a teenager. The defense also introduced favorable testimony from the defendant's two sisters and his father, and from a clergyman and the parents of his fiancee.

At the conclusion of the hearing, defense counsel argued that the defendant's background demonstrated a number of mitigating circumstances, including the commission of the offenses while the defendant was under the influence of extreme mental or emotional disturbance, the defendant's history of drug and alcohol abuse, his religious upbringing and beliefs, and his learning disability.

The defendant now argues that trial counsel should have conducted a more extensive investigation and could have presented additional testimony that was available at the time of the original sentencing proceeding. At the evidentiary hearing on the defendant's post-conviction petition, the defendant presented testimony from several witnesses in support of this contention. Dr. Keenan Ferrell, a clinical psychologist, testified that he had examined and tested the defendant over a two-day period. Personality tests showed the defendant to be impulsive, deviant, and paranoid. Dr. Ferrell found that the defendant had an IQ of 86, but Dr. Ferrell said that the defendant's grade school records credited the defendant with above-average intelligence. Dr. Ferrell believed that the decline in the defendant's abilities was indicative of a head injury, and the defendant had sustained a serious one when he was 12 or 13 years old. The defendant reported a number of incidents of abuse committed by his mother, including having liquid deter-

gent poured down his throat. The defendant began to stutter when he was seven years old, and Dr. Ferrell stated that this was a sign of emotional torment. Dr. Ferrell concluded that the defendant was emotionally and psychologically damaged. Although the defendant had no recollection of being sexually abused, Dr. Ferrell believed that many of the defendant's characteristics were consistent with sexual abuse.

Caryn Platt Tatelli, a mitigation specialist, investigated the defendant's background, interviewing more than 25 persons and reviewing a number of records. Tatelli prepared a report summarizing her findings; the report and its voluminous attachments were made a part of the defendant's post-conviction petition. Tatelli learned of a number of acts of abuse committed against the defendant by his mother. For example, while the defendant was being toilet trained, his mother would make him run outside naked if he had an accident. Also, the defendant sustained a number of head injuries when he was a child. The first one occurred when the defendant was four years old, when he fell off a bed. Later, around the age of 12, the defendant suffered an injury to his scalp that required between 20 and 30 stitches to close; shortly after that injury, the defendant's mother became angry with him and ripped the stitches open. Tatelli reported that the defendant had raped his sister Laurie when he was 12 years old and she was 9. Tatelli believed that the defendant was also sexually abused as a child.

In support of the amended post-conviction petition, the defendant also submitted affidavits from a number of relatives, neighbors, and friends who stated that they would have testified at the defendant's sentencing hearing if they had been called as witnesses. These persons described the defendant's childhood home environment as well as various incidents in the defendant's life. The defendant's parents and sisters also submitted affidavits,

stating that they were not adequately prepared by trial counsel before the sentencing hearing and describing other items of information that had not been elicited from them at the earlier proceeding.

As we have stated, in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1986), the Supreme Court formulated a two-part test for resolving claims of ineffective assistance of counsel. To prevail on a claim of ineffective assistance, a defendant must establish both that counsel's performance was deficient and that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Judicial scrutiny of counsel's performance is highly deferential, and a court considering an allegation of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Even if counsel's performance is objectively unreasonable, however, relief is not automatically warranted, for a defendant must also show that he was prejudiced as a result of counsel's deficient performance. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Because a defendant must establish both a deficiency in counsel's performance and prejudice resulting from the alleged deficiency, failure to establish either proposition will prove

fatal to the claim. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Harris*, 164 Ill. 2d 322, 349 (1994).

The defendant complains that trial counsel did not present, as mitigating evidence at the sentencing hearing, more detailed testimony regarding a series of head injuries the defendant suffered as a child, or testimony concerning the reasons for his three separate suicide attempts, among other things. The defendant maintains that the information provided by the defense witnesses at the hearing gave only a superficial analysis of his background and personality.

We are unpersuaded by the defendant's challenge to the conduct of his attorney at the sentencing hearing. Unlike defense counsel in *People v. Perez*, 148 Ill. 2d 168 (1992), cited by the defendant, defense counsel in this case presented a substantial amount of mitigating testimony. Moreover, defense counsel's strategic decision not to present other types of evidence was made after investigation and should be accorded substantial deference. Counsel explained at his deposition that the defendant had undergone a fitness evaluation by a psychiatrist before trial, and that counsel then learned of the defendant's propensity for violence from the psychiatric report. Trial counsel and the mitigation specialist thus decided not to use the information at the sentencing hearing because they believed that it would be more harmful than helpful to the defendant's case. Counsel's determination not to pursue this line of inquiry further was a strategic decision, made after investigation, and is entitled to substantial deference. In *Strickland* the Supreme Court stated:

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments sup-

port the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

The record in this case shows that trial counsel considered the possibility of introducing expert testimony about the defendant's mental condition and functioning but chose not to pursue that inquiry because counsel feared that information about the defendant's violent nature would also be revealed. Counsel's concerns were borne out at the post-conviction hearing, when Dr. Ferrell stated that his testing of the defendant showed a person who was impulsive, deviant, and paranoid.

Trial counsel's strategic decision to forgo evidence of this nature is entitled to deference. In *People v. Tenner*, 175 Ill. 2d 372, 382 (1997), this court noted "the potentially ambiguous nature of evidence of mental problems," for "information about a defendant's mental or psychological impairment is not inherently mitigating." *Tenner* stated, "At sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness." *Tenner*, 175 Ill. 2d at 382.

We believe that other evidence now offered by the defendant in support of his request for a new sentencing hearing is essentially cumulative of information presented at the sentencing hearing by trial counsel or does not give rise to a reasonable probability that its introduction at the sentencing hearing would have

produced a sentence other than the sentence of death imposed on the defendant. The defendant has prepared a table listing the items of information included in the mitigation report prepared by the post-conviction mitigation specialist, Caryn Tatelli, and omitted from the report done by Arlene Peters, who testified at the sentencing hearing. Some of this information was presented at the sentencing hearing through the testimony of other witnesses. We have examined the other items of information that the defendant contends should have been presented at this sentencing hearing, and we are not persuaded that introduction of this additional testimony would have had any effect on the judge's decision to impose the death penalty in this case. For example, testimony about the defendant's parents' own substance abuse problems would have added little to the mitigating case counsel was attempting to build. Evidence of the family's shaky finances would have been unnecessary, for the sentencer in this case, the trial judge, was aware that the defendant was required to sleep in the kitchen of the family's small house. Evidence of steady employment is mitigating (see *People v. Johnson*, 128 Ill. 2d 253, 281-82 (1989); evidence of the defendant's spotty work history would have been construed as aggravating.

In determining whether the defendant incurred prejudice as a result of trial counsel's asserted deficiencies at the sentencing hearing, we must ask "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. We do not believe that there is a reasonable probability that presentation of the additional evidence

cited by the defendant would have resulted in a sentence other than death, given the nature of the offenses in this case, and the circumstances and character of the defendant.

### III

The defendant raises a number of other claims of ineffective assistance of counsel; the judge hearing the post-conviction petition denied them without an evidentiary hearing, concluding that all of these contentions had been waived or resolved on direct appeal. Because the defendant also argues that counsel on direct appeal was ineffective for failing to challenge trial counsel's alleged deficiencies, we will consider these issues on their merits.

The defendant first argues that trial counsel was ineffective for not requesting a continuance when, on May 3, 1990, less than two weeks before trial was scheduled to begin, the grand jury indicted the defendant on a fifth count, alleging the defendant's commission of murder during the course of a robbery. The genesis for this additional count was the discovery of the victim's purse in a farmer's field near Beckemeyer on March 22, 1990. The defendant suggests that trial counsel needed additional time to investigate the circumstances surrounding the discovery of the purse. On April 26, 1990, counsel learned of the purse and of the prosecutor's intent to seek an additional charge against the defendant. The purse was sent to a laboratory for analysis, and no fingerprints were found on it or on the wallet that was inside. Moreover, hairs in the purse could not be traced to the defendant. We agree with the State that the discovery of the purse did not represent new evidence that defense counsel needed time to challenge, and that the additional charge could not have affected the defense theory at trial, which was to deny the defendant's participation in the offenses.

The defendant also argues that trial counsel was ineffective for failing to object to the prosecution's amendment of count II of the indictment. Count II originally alleged that the defendant committed the offense of first degree murder by stabbing, choking, and beating the victim about the head, "knowing such act committed [*sic*] a strong probability of death or great bodily harm." By amendment, the word "committed" was replaced with "created." Prior counsel had agreed to this change on July 26, 1989, shortly after the indictment was returned; the defendant argues that trial counsel, Maurice Killion, who was later appointed to represent the defendant in this case, should have moved for a directed finding on this count at the close of the State's evidence. Amendments to an indictment are permitted to correct formal defects, including "[a]ny miswriting, misspelling, or grammatical error." Ill. Rev. Stat. 1989, ch. 38, par. 111—5(a). Here, the amendment corrected what was merely a formal defect in the charge and therefore was permissible. See *People v. Griggs*, 152 Ill. 2d 1, 32-33 (1992). We do not believe that substitution of the word "created" for the word "committed" worked a material change in the count.

The defendant next contends that trial counsel was ineffective for failing to obtain a hair identification expert to testify to the significance of evidence showing that no hairs consistent with the defendant's hair standards were found on the victim or at the crime scene. The defendant notes that the State's forensic experts were unable to link the defendant to any of the hairs discovered after the offenses, and the defendant believes that an additional expert would have undermined the prosecution theory that the defendant removed the victim's clothing and strangled the victim without depositing any of his own hairs.

The defense did call as a witness one expert, Eleanor

Gillespie, a forensic scientist for the Illinois State Police. Gillespie had compared hairs found at the crime scene and on the victim's body with hair standards taken from the victim and the defendant, and she concluded that there was no transfer of hair between the defendant and the victim. Most of the hair samples were consistent with the victim's own hair, and none of the hairs found on the victim's body or at the scene could be linked to the defendant; at least two hairs could not be identified at all. The defendant maintains that counsel should have called another expert to testify that it would have been unlikely for the defendant to have committed the offenses without leaving behind strands of his own hair. We note that defense counsel made this argument at trial, and the defendant has not shown whether any expert was available who would have been able to couch the argument in scientific terms. The defendant's complaint is merely speculative.

The defendant next raises a series of brief challenges to the competency of trial counsel, and we will consider these in summary fashion. Contrary to the defendant's argument, we do not believe that trial counsel was ineffective for his supposed acquiescence in the trial court's decision to consider a motion under *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), during trial rather than before trial. The defendant believes that the tardy consideration of the motion meant that the trier of fact could hear evidence that would later be deemed inadmissible. We note that the judge denied the motion, so the defendant's present concerns are unfounded. In addition, the defendant's trial was a bench proceeding, and there is a strong presumption that judges base their findings only on competent evidence. *People v. Tye*, 141 Ill. 2d 1, 26 (1990).

We find no deficiency in counsel's failure to make an opening statement at trial; again, this was a bench

proceeding, and we do not believe that counsel's failure to address the court at that point in the proceedings could have had any effect on the judge's resolution of the case. We note, too, that the prosecutor, in his opening statement, merely read the indictments against the defendant. Nor do we find any deficiency in trial counsel's failure to challenge the victim's daughter's identification of her mother's purse. The purse contained the victim's driver's license, which certainly was sufficient to establish the victim's ownership.

The defendant next complains that trial counsel failed to cross-examine prosecution witness Linda Berry, the bartender at the Main Street Tavern in Beckemeyer, who testified at trial that she saw the defendant and the victim together shortly before the victim's death. Rather than cross-examine the witness, trial counsel simply noted to the court that he believed Berry's testimony was irrelevant. The defendant has not shown what greater advantage defense could have gained in this case from cross-examining the witness. Nor do we believe that counsel was ineffective for failing to ask the defendant's cellmate, Scott Nielson, what consideration, if any, the State had promised him in exchange for his testimony at trial. In discovery prior to trial the State disclosed that no promises or rewards were made to any witnesses. The defendant has neither alleged nor shown here that the prosecutor's response was untruthful in relation to Nielson.

The defendant also complains that counsel failed to argue at trial that the defendant did not have the intent to rob the victim prior to her death. The defendant believes that an argument like that could have forestalled a conviction on a felony murder theory. The defendant apparently believes that the absence of a finding on that charge would have precluded the trial judge's later determination that the defendant was

eligible for the death penalty for his commission of murder in the course of a robbery. The defense theory at trial was that the defendant did not have any role in the offenses committed here and, further, that no robbery or theft occurred. An argument like the one now proposed by the defendant would have directly contradicted that theory by placing the defendant at the crime scene and attributing to him the acts that caused the victim's death. Moreover, we note that this court, in the defendant's direct appeal, held that the defendant could be found eligible for the death penalty even if the State did not prove that the defendant had formed the intent to rob the victim before committing the murder. *People v. Todd*, 154 Ill. 2d 57, 73 (1992).

As a final matter, the defendant argues that the trial judge improperly imposed sentence only on count I of the indictment, which, the defendant asserts without explanation, is not an offense for which he may receive the death penalty. We note that the defendant was charged with four counts of first degree murder, based on sections 9—1(a)(1), 9—1(a)(2), and 9—1(a)(3) of the Criminal Code of 1961. Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3). Count I, charging first degree murder under section 9—1(a)(1), represented the most serious form of the offense and therefore is properly the one on which the sentence of death is imposed. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 377-78 (1990); *People v. Lego*, 116 Ill. 2d 323, 344 (1987); *People v. Guest*, 115 Ill. 2d 72, 103-04 (1986).

\* \* \*

For the reasons stated, the judgment of the circuit court of Clinton County is affirmed. The clerk of this court is directed to enter an order setting Thursday, January 22, 1998, as the date on which the sentence of death entered in the circuit court of Clinton County is to be carried out. The defendant shall be executed in

the manner provided by law (725 ILCS 5/119—5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*