2021 IL App (1st) 182609-U

No. 1-18-2609

Order filed June 21, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 4507 |
| | ) | |
| WAYNE SMITH, | ) | Honorable |
| | ) | Diane G. Cannon, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1　*Held*:　The circuit court's summary dismissal of defendant's *pro se* postconviction petition is affirmed where his claim for ineffective assistance of counsel is positively rebutted by the record.

¶ 2　Defendant Wayne Smith appeals from the summary dismissal of his *pro se* petition

pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)),

arguing that his petition sets forth an arguable claim that his trial counsel's ineffective assistance caused him to waive his right to a jury trial. We affirm.

¶ 3    Defendant was charged with 27 counts of aggravated criminal sexual assault (720 ILCS 5/12-14 (West 2010)) and one count of unlawful restraint (720 ILCS 5/10-3(a) (West 2010)) pursuant to an incident on February 27 and 28, 2011, involving the victim T.K.

¶ 4    At a May 1, 2013 status hearing, the trial court asked, "bench trial indicated?" and trial counsel responded, "Yes, judge." On the day of trial, the trial court explained what a jury trial was, and defendant confirmed that he understood. Defendant also confirmed that he had signed a jury trial waiver and understood that signing the waiver meant he was not having a jury trial. Before accepting defendant's jury waiver, the court asked defendant whether anyone had "promised" or "threatened" him "with anything to get [him] to give up [his] right to a trial by jury." Defendant responded, "No, ma'am" to each inquiry.

¶ 5    At trial, T.K. testified that she met defendant, whom she identified in court, through Facebook in February 2011. On February 27, 2011, she and defendant spent the day together, and she spent the night at his apartment, which he shared with his mother. Defendant consumed alcohol throughout the day, and T.K. smoked marijuana at defendant's apartment. While in defendant's bedroom, he attempted to choke her and "pushed [her] backwards onto the bed." She attempted to push him off, but became frightened because defendant reminded her "how he told [her] earlier he had a gun and he wasn't afraid to shoot [her]." While she laid in the bed crying, defendant engaged in a series of sexual acts without her consent, including penetrating her anus, vagina, and mouth with his penis. He also slapped her face and "told [her] that he loved [her] and nobody will hurt [her] except for him."

¶ 6    When defendant eventually fell asleep, T.K. grabbed her phone, pants and shirt and "ran out [of] the room." Defendant woke up before she got out the door, so she ran into his mother's room and told her that she had been raped by her son. Defendant was standing outside the room, so T.K. ran out of the apartment and called 911. Shortly thereafter, she flagged down a police officer on the street, who drove her back to defendant's home. Defendant was standing outside on the porch and she identified him as the man who raped her. She was subsequently taken to Roseland Hospital for treatment.

¶ 7    The parties stipulated that a sexual assault kit was completed at Roseland Hospital and medical personnel observed that T.K. had abrasions on her rectum and left labia. Justine Camillo, a forensic scientist for the Illinois State Police, examined the sexual assault kit and concluded there was no semen on samples taken from T.K.'s mouth, vagina, or anus, and her anal swab had "blood-like stains."

¶ 8    The parties also stipulated that Robert Stanton would testify that he received a phone call from his close friend, T.K., on February 28, 2011, at approximately 3:15 a.m. She was upset, crying and told him she had just been raped and needed a ride home because the rapist had threatened to kill her. Stanton went to the area of 123rd and Wallace, but could not speak to T.K. because the police had already arrived. Finally, the parties stipulated that Chicago police lieutenant Ronald Forgue would testify that he was driving near 123rd and Wallace on the night of the incident when he saw T.K. running down the street. She was distraught and hysterical and yelled at Forgue, "he raped me." Forgue drove with T.K. back toward defendant's home, where other officers had him standing on the front porch. At that time, T.K. identified defendant as the man who raped her.

¶ 9    N.B. testified as an other crimes witness regarding her interactions with defendant. In October 2009, N.B. and defendant had an unpleasant and "painful" sexual encounter. The next day, she agreed to see defendant again under the condition there would be "absolutely no sex." That night, defendant threatened N.B. with a firearm and told her to remove her shorts, then vaginally and anally penetrated her against her will. During the incident, defendant told her, "I don't ask for p****, I take it." N.B. called the police two days later, and went to the hospital and underwent a sexual assault kit.

¶ 10    Defendant's mother, Isabella Smith, testified that on the night of February 27, 2011, defendant, T.K., and two other individuals arrived at the apartment Isabella shared with defendant. After some time, they all left but defendant and T.K. returned approximately 15 to 20 minutes later and went to defendant's room. Isabella later heard what she believed was the two "having sex," but did not hear any sounds resembling a call for help or slapping. When she checked on them later through the crack of defendant's bedroom door, they were asleep in his bed. Shortly thereafter, T.K. entered Isabella's room, "dived into [her] bed," whispering that defendant had "choked her, he smacked her and he raped her." T.K. started "hollering and screaming," and asked Isabella to call her a cab. Defendant entered the room and "he was like, what, are you serious."

¶ 11    The parties stipulated that Chicago police officer Anita Williams would testify that on February 28, 2011, she met with T.K. at 3:12 a.m. T.K. told Williams that she had wanted to spend the night with defendant, and while in his bedroom, she removed her clothes and laid down in defendant's bed with him to watch television.

¶ 12    Defendant testified that at some point that evening, he and T.K. left his apartment to purchase marijuana. They later returned and went to his bedroom, watched a movie and smoked

the marijuana. They started kissing, which led to sexual intercourse. T.K. never told him to stop during their sexual encounter. Early the next morning, T.K. "jumped up," exited his bedroom, and entered his mother's room. Defendant followed T.K. and heard her "yelling" that he had raped her. He also heard her tell someone on her phone that "he just raped me, I want you to kill him." Defendant called 911 on his phone and went to get dressed. He later went outside to speak further with police on his phone. Defendant denied that he choked, slapped, or threatened T.K. with a firearm, though he did inform her earlier that night that he had a firearm.

¶ 13    On cross-examination, defendant acknowledged that he drank alcohol from approximately noon to 11:30 p.m. that day, but denied being intoxicated.

¶ 14    The trial court found defendant guilty of two counts of aggravated criminal sexual assault. The court later corrected its findings to guilty of three counts of aggravated criminal sexual assault through threat, involving contact between defendant's penis and T.K.'s anus (count IV), vagina (count XII), and mouth (count XXI) (720 ILCS 5/12-14(a)(3) (West 2010)). Defendant was sentenced to consecutive 15-year sentences on counts IV, XII, and XXI, for a total of 45 years' imprisonment. On direct appeal, his convictions were affirmed. See *People v. Smith*, 2017 IL App (1st) 150234-U.

¶ 15    On August 1, 2018, defendant filed a *pro se* postconviction petition, claiming that trial counsel was ineffective because, "on the day of trial," counsel threatened to withdraw and told defendant that if he withdrew, the trial court would not appoint new counsel. Defendant alleged this threat forced him to waive his right to a jury trial. On October 17, 2018, the circuit court summarily dismissed the petition, stating that it was "patently frivolous and without merit."

¶ 16    In this appeal, defendant asserts that his petition states an arguable claim for ineffective assistance of counsel.

¶ 17    The Act provides a mechanism for a criminal defendant to challenge his conviction on the basis that it violates his state or federal constitutional rights, or both. *People v. Lesley*, 2018 IL 122100, ¶ 31. Petitions pursuant to the Act are considered in three stages. *Id.* At the first stage, the defendant need only allege the "gist" of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24. Despite this low pleading standard, a defendant must still allege facts that are capable of independent corroboration to support his claim. *Id.* If the defendant's petition does not allege a sufficient basis in law or fact to support his claim, the circuit court may dismiss on the basis that the petition is "frivolous" or "patently without merit." *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009). The circuit court must construe all well-pleaded allegations in favor of the defendant, but if an allegation is positively rebutted by the record, the circuit court should not accept it. *People v. Sanders*, 2016 IL 118123, ¶ 48. If the record positively rebuts a defendant's claim, it is subject to summary dismissal. *People v. Knapp*, 2020 IL 124992, ¶ 50. A trial court's decision to summarily dismiss a postconviction petition at the first stage is reviewed *de novo*. *Id.* ¶ 42.

¶ 18    A criminal defendant is entitled to effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668 (1984). To establish an ineffective assistance claim, a defendant must demonstrate that his counsel's conduct was objectively unreasonable, and that this conduct prejudiced him. *People v. Moore*, 2020 IL 124538, ¶ 40. At the first stage of postconviction review, the defendant need only establish arguably deficient conduct and arguable prejudice. *Hodges*, 234 Ill. 2d at 17.

¶ 19    Defendant's claim that his trial counsel was ineffective implicates his right to a trial by jury. A criminal defendant has the right to a trial by jury. U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. A defendant can waive this right, but only if he does so knowingly and voluntarily. *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). The trial court has a duty to ensure the defendant's waiver is proper, but there is not a precise formula for the admonishments the court must provide. *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). That a defendant signed a jury waiver form is not conclusive of his knowing and voluntary decision to waive his right to a jury trial, but it may constitute evidence of the defendant's intent. *Bracey*, 213 Ill. 2d at 270-71. Where a defendant claims his counsel's ineffective assistance caused him to improperly waive his right to a jury trial, the defendant can establish prejudice by demonstrating a reasonable probability that but for the deficient conduct, the defendant would have proceeded by jury trial. *People v. Todd*, 178 Ill. 2d 297, 318 (1997).

¶ 20    Here, defendant claims that trial counsel forced him to involuntarily waive his right to a jury trial by threatening to withdraw on the day of trial. Defendant further alleges that counsel informed him that the trial court would not appoint a new attorney if he withdrew. Immediately prior to trial, the court asked defendant if he had signed a jury waiver. Defendant affirmed. The court then inquired whether defendant understood he had a right to a jury trial. Defendant again affirmed. Finally, the court asked whether anyone had made any promises or threats to procure defendant's jury trial waiver, and defendant responded, "No, ma'am."

¶ 21    We find that the circuit court did not err in summarily dismissing defendant's petition because his claim for ineffective assistance is positively rebutted by the record. The State argues, and we agree, that the supreme court's recent decision in *Knapp* supports this result.

¶ 22    In *Knapp*, the defendant claimed in his postconviction petition that he unknowingly and involuntarily waived his right to testify due to trial counsel's ineffective assistance. *Knapp*, 2020 IL 124992, ¶ 33. At trial, defendant advised the court that he understood the decision whether to testify was his and his alone. *Id.* ¶ 26. The circuit court dismissed the petition at the first stage, the appellate court affirmed, and the supreme court affirmed the appellate court's judgment. *Id.* ¶¶ 2, 35. The supreme court explained that because the trial court informed the defendant that he had a right to testify, and the defendant affirmed that he did not want to testify at a proceeding subsequent to counsel's allegedly deficient conduct, the record positively rebutted the defendant's ineffective assistance claim such that it was subject to summary dismissal. *Id.* ¶¶ 51-54, 58. In so ruling, the supreme court explained, "petitioner's responses during the trial court's admonishments unequivocally rebut his allegations that his decision not to testify was involuntary or based on allegedly erroneous advice from counsel." *Id.* ¶ 54.

¶ 23    Similarly, defendant claims that he did not make a knowing and voluntary jury waiver because his counsel made threats to procure his waiver. But subsequent to the alleged threats, in response to admonishments from the trial court, defendant stated unequivocally that he had not been threatened or promised anything in exchange for his jury trial waiver. Thus, as in *Knapp*, defendant's responses in open court rebut his claim that he involuntarily waived his right to a jury trial. It follows that defendant's claim is positively rebutted by the record.

¶ 24    For the foregoing reasons, the circuit court's summary dismissal is affirmed.

¶ 25    Affirmed.