Docket No. 80084–Agenda 3–November 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID HARRIS, Appellant.

 Opinion filed April 16, 1998.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, David Harris, was convicted of first degree murder and attempted armed robbery. The defendant waived a jury for purposes of a capital sentencing hearing, and, after a hearing, the trial judge sentenced the defendant to death for the murder conviction. The defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons stated below, we affirm the judgment of the circuit court.

The evidence in this case is largely undisputed and may be summarized briefly; other evidence will be reviewed as it becomes relevant. At trial, Bernice Chase, the widow of the victim, Clifford Chase, testified that she and her husband watched a movie on the evening of June 7, 1993. Afterwards, Mr. Chase left the house around 8:40 p.m. to return the rented videotape. Mrs. Chase said that her husband would sometimes stop to buy milk at the Chatham Food Center, where he was killed.

Theresa Barnes, 16 years old at the time of the occurrence, testified that she was at the Chatham Food Center around 9 p.m. on June 7, 1993; the store was located at 79th and Calumet Streets. While she was using a pay telephone outside the store, she heard the sound of a gunshot. Barnes looked up and saw someone holding a gun, and she then heard another shot. The shot was fired at a car. Barnes then saw a person inside the car slump over, and the car started to roll toward where she was standing. The person who fired the shot got in the back seat of a Mercedes, which then drove off. Barnes identified the defendant as the gunman. Barnes estimated that she was standing about 20 to 25 feet away from the car when the shots were fired, and she testified that she got a good look at the gunman. On June 9, 1993, police officers showed Barnes a brochure of various Mercedes models, and Barnes selected one that matched the car she had seen. About a week later, on June 15, Barnes viewed a lineup and identified the defendant in the lineup at the person who had fired the shots.

On cross-examination, Barnes acknowledged that she had provided different officers with somewhat different descriptions of the gunman. She told the first officer on the scene that the gunman was a black male, 5 feet 11 inches, weighing 170 pounds. Later, she told a different officer that the shooter was a black male, 5 feet 10 inches to 6 feet, weighing 150 to 160 pounds, and 17 to 18 years old. Barnes testified further that the defendant had bushy hair, and that he was the only person in the police lineup with bushy hair. Barnes also said that the defendant had a wide nose and wide lips. Although Barnes told investigating officers that the shooter wore a blue terry cloth jacket with a hood, with pink and yellow accents, and an Aladdin genie on the back, at trial she did not recall seeing a figure or emblem on the back of the jacket.

Theodore Traylor, who was with the defendant when the offenses were committed, also testified on behalf of the State at trial. Traylor said that on June 7, 1993, around 8:30 p.m., he was standing at 67th and Ada Streets with Antoine Moore. At that time, some of Moore's friends drove up in a grey Mercedes. In the car were the defendant, Howard McClinton, and Demetrius Daniels. Traylor had seen the three previously. After they talked to Moore, Moore told Traylor to get in the car and they would take him home. Traylor lived at 79th and Woodlawn, which he said was a “couple” miles away. McClinton was driving, and Moore sat in the front seat; Traylor, Daniels, and the defendant sat in the back, with Traylor in the middle. According to Traylor, the four others talked about a movie they had seen, “Menace to Society,” which was about carjacking; Traylor had not seen the movie. After 15 or 20 minutes they reached 79th and Calumet Streets. There, McClinton, the driver, saw some girls to whom he wanted to talk. McClinton pulled into a parking lot, but the girls did not want to talk to him. Then, McClinton said, “There go a jack move there.” According to Traylor, McClinton drove toward an old man who was leaving a grocery store. The man got in his car, and McClinton pulled the Mercedes near the man's car. Traylor testified that McClinton handed Moore a gun and said, “Jack him.” Moore got out of the Mercedes and tapped on the window of the victim's car, but the man would not open the door; he instead turned the ignition on. Moore told the man to get out of the car and tapped on the window with the gun. Moore then got back in the Mercedes and said to shoot the victim. The defendant jumped out of the car, pulled a gun from under his shirt, and shot the victim twice. The defendant then jumped back into the car, and the Mercedes drove off.

Traylor testified that he then asked the others to take him home. They were laughing about the shooting. Traylor said that he had not known that they would try to take a car at gunpoint. They drove Traylor to Woodlawn, where he was then staying. Traylor said that he saw Moore two or three days later, when Moore came to his house. Traylor turned himself in on June 17, when he learned that the police were looking for him. Traylor said that he told the authorities what had happened and later signed a handwritten statement describing the offenses.

The parties stipulated that an evidence technician would testify that bullets were recovered from the front seat and the back floor of the victim's car. The parties also stipulated that a firearms expert would testify that he concluded from his examination of the bullets that they had been fired from the same weapon, a .38 Special revolver.

At trial, the prosecution also presented testimony detailing the defendant's inculpatory statements to authorities. Detective Herman Cross, assigned to Area 2 violent crimes, testified that early in the morning of June 12, 1993, he learned that the Mercedes involved in the crimes had been stopped. The investigation eventually led Cross to Moore, Daniels, McClinton, and the defendant. Cross found the defendant on June 15, 1993, and he and his partner, Bernatek, transported defendant to Area 2 headquarters. There, they arranged a lineup, at which Theresa Barnes identified the defendant as the gunman. Cross and Bernatek then gave the defendant 
Miranda
 warnings and, after the defendant agreed to waive those rights, questioned him about the case. In a brief statement, the defendant said that he and Antoine Moore got out of a silver Mercedes, walked up to the victim's car, with Moore on the passenger's side and the defendant on the driver's side. The defendant pointed a gun at the car window and someone called out, “Bust him, bust him.” The defendant then fired two shots.

On cross-examination, Detective Cross explained that a report about the lineup and photographs of the lineup participants had been lost and could not be found. Cross said that the five other participants in the lineup were comparable to the defendant in height, weight, and complexion, and Cross also said that two others had bushy hair similar to the defendant's. Cross testified that the police did not recover a jacket matching the description provided by Theresa Barnes.

Further evidence regarding the defendant's inculpatory statements was provided by Peggy Chiampas, an assistant State's Attorney in Cook County who took a formal statement from the defendant. Chiampas testified that she was summoned to Area 2 headquarters on June 15, 1993. She spoke to Detectives Cross and Bernatek and reviewed police reports about the case. She first questioned the defendant around 8 o'clock that night. After waiving 
Miranda
 rights, the defendant told Chiampas about the offenses. He then agreed to repeat the statement in the presence of a court reporter. After the statement was transcribed, Chiampas reviewed it with the defendant, who made several corrections. The statement was then initialed by the defendant and Chiampas, as well as by Detective Bernatek and Chiampas' supervisor, who were also present during the statement.

In the statement, the defendant said that on June 7, 1993, around 6 p.m., he was home when four persons came over: Howard McClinton, Demetrius Daniels, Antoine Moore, and Theodore Traylor. The defendant took his gun with him, a .38, and all five then drove to the area of 68th and Ada, in a Mercedes. McClinton was driving, Moore was in the front seat, and the three others were in the back seat. McClinton also had a gun with him. With the exception of Traylor, they talked about a movie they had seen, “Menace to Society,” which was about carjacking. They stayed at 68th and Ada for about two hours. Then, all five got back in the car and drove down Calumet Street. Moore talked about the movie again, and as they crossed a street, Moore said, “Let's jack that mark in the lot.” McClinton thought that the person looked young and might have a gun; he believed that older persons were less likely to be armed and therefore made better targets. By this time they had driven into a parking lot, and there Moore got of the car, with a gun in his hand. According to the defendant, Moore ran up to a car, which was occupied by a man, and tried to open the door. The door would not open, so Moore told the man to get out. Without replying, the man tried to back up his car. Moore ducked away and said, “Bust him,” which the defendant said meant to shoot him. The defendant jumped out of the back seat and shot the victim twice. The first shot shattered the car window; the second shot hit the driver. The defendant then heard his friends yelling at him, and he returned to the Mercedes. Later that night, Moore was laughing and joking about the offenses; according to the defendant, he told Moore that it was wrong to tell him to shoot the victim. The next day, Moore, McClinton, and Daniels came over to the defendant's house. Moore said that he would get rid of the gun used by the defendant in the offenses, and the defendant gave it to him.

The parties also stipulated that Dr. Barry Lifschultz, an assistant medical examiner for Cook County, if called as a witness would testify that he performed an autopsy on the victim on June 8, 1993. The autopsy revealed that the cause of death was a gunshot wound to the head.

The only evidence presented by the defense was testimony by Charles Moore, deputy chief investigator for the Cook County public defender's office. Moore stated that he took four photographs of the defendant on June 17, 1993, two days after he gave his statements in this case. Moore took the photographs while the defendant was in the lockup area of a courtroom. The photographs depict the defendant's face and head. These photographs had been shown to Assistant State's Attorney Chiampas and Detective Cross during cross-examination; both witnesses testified that the photographs revealed only one injury, to the defendant's lip.

In rebuttal to the preceding evidence, the prosecution presented, through a stipulation, the statement of Officer Hughes concerning the lockup area for Area 2. On June 16, 1993, around 1:15 a.m., Detective Cross returned the defendant to the lockup area, so that he could be transferred back to the Cook County jail. Hughes, if called as a witness, would have testified that he performed a visual examination of the defendant and did not observe any injuries on him at that time. Hughes also asked the defendant a series of questions about his condition, and would have testified that the defendant did not report any pains or injuries.

At the conclusion of the evidence, the jury returned verdicts finding the defendant guilty of first degree murder and attempted armed robbery. The cause was then continued for a capital sentencing hearing, which was held about a month after the conclusion of the trial. Before jury selection for trial, the defendant had waived his right to a jury for any capital sentencing hearing, and the hearing was therefore conducted before the trial judge alone. At the first stage of the hearing, the State introduced a verified copy of the defendant's birth certificate, which showed that he had attained the age of 18 at the time of his commission of the present offenses. The State also introduced copies of the verdicts returned by the jury in this case, showing the defendant's convictions for first degree murder and attempted armed robbery. The trial judge found the defendant eligible for the death penalty because of the defendant's commission of murder in the course of another felony. See 720 ILCS 5/9–1(b)(6) (West 1994).

The parties then presented evidence in aggravation and mitigation. In aggravation, the State first introduced victim impact testimony from the victim's widow, Bernice Chase, and the victim's two daughters, Nona Ocloo and Olivia Chase.

The State also presented evidence detailing prior offenses committed by the defendant. Edwina Harrison described a carjacking committed by the defendant on June 5, 1993, just two days before the offenses involved here. Harrison testified that she was driving home from work around 3:10 that morning when she pulled off the road because a friend driving behind her had flashed his lights and pulled over. The friend got in Harrison's car. Immediately after that, two young men pulled up; one of the men, whom Harrison identified in court as the defendant, got out of the passenger's side of the car, holding what appeared to be an automatic rifle or machine gun. The defendant pointed the gun at Harrison and told her to get out of her vehicle. Harrison and her friend got out of the car, and Harrison thought that the defendant was going to kill them. The defendant backed away from them and drove off in her car. Harrison testified further that she viewed a lineup on June 11, 1993, and identified the defendant as the person who had taken her car.

Detective Michael McDermott, of the Chicago police department, also testified at the sentencing hearing. McDermott stated that he investigated a carjacking committed by the defendant on June 3, 1993. According to McDermott, the victim of the carjacking, Kirschmar Norman, arrived home from work around 1:50 in the morning. As Norman was getting out of his car, he saw a person approach from a nearby van. The person was carrying a Tech 9 mm machine pistol, which he pointed at Norman. The person told Norman to put his money and keys on the ground, and Norman complied. The person then picked those items up and got in Norman's car. The van from which the person had appeared pulled away and was involved in an accident. The driver of the van ran over to Norman's car and got in with the first person, and they then drove off. Norman viewed a lineup in December 1993 and identified the defendant as the person who had taken his car.

The State also presented evidence of two drug offenses committed by the defendant. On one occasion, on March 5, 1992, a plainclothes police officer saw the defendant engaged in what appeared to be a drug transaction. As the officer approached, the defendant turned, walked away, and let go of three bags, which were later found to contain cocaine. The defendant later pleaded guilty in this case and received a period of section 1410 probation. On another occasion, on May 22, 1992, an undercover officer saw the defendant, who was sitting at a table, drop a napkin that contained five small plastic bags. The contents of the bags were tested and found to contain cocaine.

Further evidence in aggravation came in the form of testimony relating the defendant's misconduct while in jail awaiting trial in the present case. Deputy Sheriff Alonzo King testified that on November 6, 1993, the defendant was found in an unauthorized area and refused to be included in the inmate count. The defendant received an oral reprimand for these infractions. Deputy James Brown testified that on May 11, 1994, during a search for weapons, two six-inch homemade knives were find inside the mattress of the defendant's cell. The defendant received 20 days in isolation as a result. On April 9, 1995, Deputy Brown found the defendant on the wrong tier of cells; when Brown asked the defendant to explain his presence there, the defendant swore at the deputy. The defendant received 10 days in isolation for the infractions.

Deputy Robert Adorjan testified that on August 17, 1994, he was performing a routine cell check when he found a piece of metal nine inches long and one inch wide among the defendant's belongings. It was sharpened at one end and had strips of cloth for a handle. For this infraction the defendant was given 10 days in isolation.

Lieutenant Ramon Torres testified that on September 14, 1994, he received a report of a fight. He found the defendant with a shank in his hand. Another inmate said that he had been jumped by the defendant and others. The defendant was given 29 days in isolation–the maximum penalty–for these violations.

Deputy Donnie Booker testified that on May 28, 1995, he was assigned to help quell a riot after a jail inmate had been murdered. As Booker was searching cells, he found a homemade knife, about two feet long, in the defendant's mattress. The defendant received 29 days in isolation as a consequence.

Peggy Chiampas, the assistant State's Attorney who had taken the defendant's formal statement, also testified at the defendant's sentencing hearing. Chiampas said that throughout her interrogation the defendant never exhibited any remorse for the offenses and seemed “cool, calm, and collected.” Chiampas also read into the record two pages of the defendant's statement that had been omitted from evidence at trial. In this portion of the statement, the defendant said that he and the four others with him in the car that night were members of a street gang, the Black Disciples. The defendant held the title of assistant regent, and he was to discipline gang members who broke gang rules. On cross-examination, Chiampas said that the defendant, in reviewing the statement he had given to the court reporter, added the comment that Antoine Moore was laughing and joking after the murder, and that the defendant replied that it was wrong for Moore to tell him to shoot the victim.

The defendant did not present any testimony at the hearing, but counsel did submit 17 letters from family members and friends of the defendant. These persons wrote favorably about the defendant. Counsel also presented, by way of stipulation, testimony from an officer who investigated the carjacking of Edwina Harrison. The officer would have testified, if called as a witness, that Harrison described the offender as being 28 years old and 5 feet 6 inches tall.

At the conclusion of the hearing, the trial judge found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty, and the judge therefore sentenced the defendant to death for the first degree murder of Clifford Chase. The judge did not impose any sentence on the defendant's separate conviction for attempted armed robbery.

I

A

The defendant raises on appeal a number of challenges to his convictions and death sentence. We will first address the issues arising from the guilt phase of the proceedings, and we will next consider the issues involving the capital sentencing hearing.

The defendant first argues that he was not proved guilty of the offense of attempted armed robbery. The indictment in this case alleged that the defendant took a substantial step toward the commission of armed robbery by ordering the victim from the car and shooting him. The defendant correctly observes that the prosecution failed to present any evidence that the defendant ordered the victim from the car, and the defendant therefore argues that he was not proved guilty of the offense. The defendant notes that, although Moore told the victim to exit the car, the defendant was not tried on an accountability theory.

The defendant does not contend that the indictment is defective, or that there was a fatal variance between the language of the indictment and the evidence offered at trial. Indeed, it appears that the allegation in the indictment that the defendant ordered the victim from the car may be regarded as mere surplusage. See 
People v. Coleman
, 49 Ill. 2d 565, 571 (1971).

In evaluating a challenge to the sufficiency of evidence, a reviewing court must consider the evidence most favorably to the prosecution. See 
People v. Young
, 128 Ill. 2d 1, 48-50 (1989); 
People v. Collins
, 106 Ill. 2d 237, 261 (1985), quoting 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). We believe that the evidence in the present case was sufficient to sustain the defendant's conviction for attempted armed robbery. According to the defendant's statements and the testimony of Theodore Traylor, the occupants of the vehicle, with the exception of Traylor, were discussing carjackings while they were driving around just before the victim's murder. The driver, Howard McClinton, expressed the view that older persons were less likely to be armed than younger persons, and that theory apparently motivated their selection of the victim in this case. After McClinton drove into the parking lot, Antoine Moore got out of the Mercedes and tried to open the door of the victim's car. When the victim's door did not open, Moore ordered the victim from his vehicle. When the victim refused to comply, Moore got back in the Mercedes. At that point the defendant got out of the car and fired a shot at the victim's window, shattering it. The defendant next fired a shot at the victim, striking him. Viewed in a manner most favorable to the prosecution, the evidence presented at trial was sufficient to establish the defendant's guilt for the offense of attempted armed robbery. The guilty parties had discussed carjacking and had selected a victim for that end. By firing a shot at the victim's car window, the defendant took a substantial step toward the planned offense of taking the victim's car.

The defendant makes the related contention that his convictions for first degree murder and attempted armed robbery were improperly based on the same physical act, the shooting of the victim by the defendant. Citing 
People v. King
, 66 Ill. 2d 551 (1977), the defendant contends that multiple convictions may not be based on the same act. What the defendant overlooks, however, is that he fired two shots at the victim: the first shot shattered the car window but did not strike the victim, and the second shot struck the victim in the head, killing him. While the defendant's conviction for first degree murder must be based on the second, fatal shot, his conviction for attempted armed robbery may be based on the first shot, as our preceding discussion makes clear. Thus, unlike the conduct in 
People v. Johnson
, 154 Ill. 2d 356, 370-72 (1993), which the defendant cites, discrete physical acts underlie each offense here. The defendant's separate convictions for murder and attempted armed robbery are therefore proper in this case. 
People v. Rodriguez
, 169 Ill. 2d 183, 188-89 (1996).

The defendant's conviction for attempted armed robbery formed the basis for the trial judge's subsequent determination, under section 9–1(b)(6) of the Criminal Code of 1961 (720 ILCS 5/9–1(b)(6) (West 1994)), that the defendant was eligible for the death penalty. In a final argument involving the conviction for attempted armed robbery, the defendant contends that the conviction may not serve as a predicate for his eligibility under that statutory aggravating circumstance because doing so could result in an improper double enhancement of the offense of attempted robbery. As we have just determined, however, the convictions for attempted armed robbery and first degree murder were based on separate acts. Accordingly, the use of the offense of attempted armed robbery to establish the defendant's eligibility for the death penalty could not produce an improper double enhancement.

B

The defendant next contends that the trial court erred in permitting the State to introduce evidence that implied that the car occupied by the defendant and his friends at the time of the offenses had previously been stolen. The defendant also argues that trial counsel was ineffective for failing to seek to bar introduction of this evidence.

At trial, the State presented evidence regarding the recovery of the Mercedes used in the murder. Detective William Egan of the Chicago police department testified that on June 9, 1993, after receiving information from another officer, he went to Evergreen Park, where he spoke to a woman named Delores Barnes. Delores Barnes and Theresa Barnes are not related. Egan then spoke to Theresa Barnes, showing her a brochure of Mercedes Benz models. Following those conversations, Detective Egan had a broadcast issued for the license plate and model of Delores Barnes' car. On June 12, 1993, Officer John Graham of the Chicago police department went to the vicinity of 69th and Loomis Streets in response to a report that the car being sought was possibly located there. Officer Graham found the car in that area and stopped the vehicle. It held seven occupants, six of whom were juveniles. The defendant was not in the car on that occasion.

The parties stipulated that an evidence technician would testify that on June 12, 1993, he went to the location where the Mercedes had been recovered and saw red stains on the driver's seat. He also took a number of fingerprint and palmprint impressions from the vehicle. The parties further stipulated that none of the fingerprints taken from the car when it was recovered matched those of the defendant, McClinton, Moore, or Daniels. The palmprints were also negative.

Although defense counsel raised this issue prior to trial, the judge did not then rule on whether the evidence was admissible, preferring to wait until the testimony was offered at trial. During trial, however, defense counsel did not object to introduction of the evidence, and therefore the defendant has waived the objection. Recognizing counsel's procedural default, the defendant argues that introduction of the evidence was plain error and, alternatively, that counsel was ineffective in failing to object the evidence.

Supreme Court Rule 615(a) provides that, on review, “Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.” 134 Ill. 2d R. 615(a). The plain error doctrine therefore provides a limited exception to the normal rule of waiver, and the doctrine may be invoked when either the evidence is closely balanced or the alleged error is so fundamental that it denied the defendant a fair trial. 
People v. Bounds
, 171 Ill. 2d 1, 41 (1995), citing 
People v. Banks
, 161 Ill. 2d 119, 143 (1994); 
People v. Childress
, 158 Ill. 2d 275, 300 (1994); 
People v. Fields
, 135 Ill. 2d 18, 56 (1990). We do not believe that either condition obtains here. The evidence of the defendant's guilt was overwhelming. Theresa Barnes and Theodore Traylor provided eyewitness testimony of the defendant's commission of the offenses. Moreover, the defendant's statements to authorities also detailed his involvement in the crimes. Nor do we believe that introduction of the evidence challenged here affected a fundamental right. Without determining here whether the evidence was properly admitted to show the steps in the investigation and to account for the delay in the defendant's apprehension and arrest (see 
People v. Lewis
, 165 Ill. 2d 305, 346 (1995); 
People v. Hayes
, 139 Ill. 2d 89, 130 (1990)), we do not believe that its introduction jeopardized the defendant's right to a fair trial. On this record, then, we are unable to conclude that introduction of the evidence suggesting that the Mercedes used in the crimes was stolen rose to the level of plain error.

The defendant presses the alternative argument that trial counsel was ineffective for failing to object to the testimony about the ownership of the Mercedes. 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984), provides a two-part test for evaluating claims of ineffective assistance of counsel. A defendant alleging ineffective assistance must generally demonstrate both that counsel's representation was deficient and that he was prejudiced as a result. To establish prejudice, a defendant “must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. In reviewing a claim of ineffective assistance, a court “need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.” 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

In the present case, even if we assume that trial counsel erred in failing to object to the evidence challenged here, we conclude that the defendant is unable to establish the prejudice portion of the 
Strickland
 standard. As we noted in our preceding discussion of plain error, evidence of the defendant's guilt for the charged offenses was overwhelming, consisting of Theresa Barnes' and Theodore Traylor's eyewitness testimony and of the defendant's confession to the crimes. Similarly, we do not agree with the defendant's further contention that defense counsel's inquiry concerning the red spot on the front seat of the Mercedes was so prejudicial that counsel can be said to be ineffective.

C

The defendant next argues that the trial judge improperly limited defense counsel's cross-examination of prosecution witness Theodore Traylor. Traylor, it will be recalled, was in the car with the defendant before the offenses were committed, and at trial Traylor identified the defendant as the shooter. The defendant contends that the trial judge's rulings, which restricted counsel's questioning in five different areas, denied counsel an opportunity to fully explore the witness' biases and to test the witness' ability and opportunity to observe. We will discuss these rulings in turn.

The defendant first challenges the trial judge's restrictions on the defense cross-examination of Traylor regarding the witness' presence at 67th and Ada Streets, prior to his ride in the Mercedes with the defendant. On cross-examination, Traylor gave various responses to defense counsel's questions asking why he was at that location. Traylor initially said that he was there “to watch this person so I can get off my debt.” Traylor then said he was there “to pay [a drug dealer] money.” Traylor denied, however, that he went there to watch over a narcotics operation and insisted that he was “against drug dealers.” Defense counsel then attempted to impeach Traylor with a prior inconsistent statement, made to police, that he had gone to that location to guard a narcotics operation. The trial judge sustained the State's objection, however. Traylor went on to say that he spent the day there shooting dice. The defendant argues that the trial judge erred in sustaining the State's objection to the question. The defendant contends that the proffered impeachment was admissible to challenge Traylor's credibility and his ability to recall the events of the day of the occurrence.

We find no abuse of discretion in the trial judge's ruling. The reasons for the witness' presence at the place where he was picked up by the Mercedes were not material to the present case. Impeachment of a witness is limited to relevant matters, and therefore it was not error for the trial judge to bar impeachment on this topic. 
People v. Sandoval
, 135 Ill. 2d 159, 181 (1990).

The defendant next contends that the trial judge improperly limited counsel's cross-examination of Traylor regarding details of the witness' prior conviction for possession of a controlled substance with intent to deliver. Asked about the conviction on cross-examination, Traylor said he was innocent of the offense, and he offered different exculpatory explanations for his conduct, mentioning that he possessed the drugs for his own use and also that he found the drugs as the police approached him. Defense counsel then attempted to question the witness further about his assertion that he found the drugs on the ground, but the trial judge sustained the prosecutor's objections.

The defendant contends that the trial judge improperly limited this line of inquiry. We find no abuse of discretion in the trial judge's ruling. Traylor did not deny the fact of the conviction, but simply attempted to provide an innocent explanation for his possession of the contraband. The jury was not misled about the conviction. 
People v. Cruz
, 162 Ill. 2d 314, 378 (1994).

In his next contention regarding Traylor's cross-examination, the defendant argues that the trial judge erred in barring questions that were designed to explore what the defendant characterizes as the witness' hostility and animosity toward defense counsel. Traylor testified that he left the Chicago area after the offenses were committed. Referring to the witness' statement that he supported himself by selling candy for his church, defense counsel asked Traylor how he was able to pay for his travels:

“Q. How do you support your travelling hobby? How do you pay for it? All through the candy sales?

A. No, through people like you.

Q. You get it from lawyers' money?

A. Uh-huh.

Q. I don't understand what that means.

You know me? You know me before today?

A. No.

Q. You ever see me before today?

A. No. I said through people like you.

Q. Do you have a business of filing lawsuits or something? You collect money? What do you mean, sir, people like me support your travel hobby?

A. Yep.

Q. And can you tell, give me some kind of idea what that possibly means?

[Prosecutor]: Objection, Judge. What is the relevance?

THE COURT: Sustained.

THE WITNESS: People pay my way around–

THE COURT: When I say `sustained,' it means do not answer.”

The defendant contends that the trial judge's ruling improperly foreclosed further questioning about the witness' apparent animosity toward counsel. We do not agree with the defendant's view that Traylor was exhibiting animosity toward the defense lawyer. First, as the witness pointed out, he did not say that the defendant's lawyer supported his traveling, but that persons like defense counsel did so. Second, we believe that the line of inquiry touches on only collateral matters, and that the trial judge therefore acted properly in limiting further cross-examination on the subject.

Defense counsel also attempted to cross-examine Traylor on whether he had ever received psychiatric treatment, but the trial judge sustained the State's objections to that line of questioning. The defendant renews here his argument that the trial judge's ruling was erroneous.

Traylor had left the Chicago area after the offenses involved here, testifying that he went to North Carolina long enough “to push my bullet back in my leg and back.” Earlier, Traylor had mentioned that he had been shot and uses crutches. Asked whether he went to see a doctor, Traylor said, “I went to see a special person.” Asked whether that visit occurred in a hospital, Traylor said, “No, it's a special place.” Defense counsel then asked what the special place was; the State objected, and the trial judge sustained the objection. Defense counsel then asked whether Traylor had received psychiatric treatment, but the trial judge sustained an objection to that question also.

The defendant argues that the trial judge's rulings improperly limited the scope of cross-examination. The defendant contends that a witness' mental health history is a proper subject of cross-examination, and the defendant maintains that further inquiry was warranted here by Traylor's enigmatic responses that he had received treatment “to push bullets back in his back and leg” from a special person in a special place. We do not agree. Traylor's responses did not suggest that he had sought psychiatric treatment, but only that he was somewhat evasive about the location and identity of the treatment he had then received.

In a further argument relating to Traylor's cross-examination, the defendant contends that the trial judge erroneously limited questions about the circumstances surrounding Traylor's detention by the police after he turned himself in for questioning on this case. The trial judge sustained the prosecutor's objections to certain questions about the nature and length of Traylor's detention. The defendant now argues that the trial judge's rulings improperly prevented him from exploring a possible area of bias on the part of the witness, and possible motivation for the witness to testify on behalf of the State.

The trial judge allowed some questions on the circumstances of the defendant's detention in relation to this case. Thus, on cross-examination, defense counsel asked Traylor, without objection, how long he was with the police and whether he was ever charged in the case. Traylor replied that he could not remember very well but believed he was questioned for 48 or 72 hours; Traylor also denied that police threatened to arrest him and charge him with murder.

The defendant contends that Traylor at some point was apparently charged with these offenses, contrary to Traylor's testimony. As evidence of this, the defendant refers to a copy of a felony minute sheet appended to the defendant's post-trial motion; the document recites that Theodore Traylor, aged 27, was charged with the murder of Clifford Chase, which occurred on June 7, 1993. The source of the document is not clear, however. The defendant also contends that he made an offer of proof on these charges in a sidebar, but that this discussion, like other sidebars in the case, was not memorialized by the court reporter. Still, it was defendant's duty, as appellant, to provide a record that would support his allegations of error.

We note that defense counsel was permitted to ask some questions regarding Traylor's stay at the police station. Even if the trial judge erred in restricting counsel's cross-examination on the circumstances of Traylor's questioning by authorities, we believe that any error was harmless beyond a reasonable doubt. 
People v. Williams
, 164 Ill. 2d 1, 14-15 (1994). The evidence of guilt in this case was overwhelming, consisting not only of Traylor's testimony but also of Theresa Barnes' testimony and the defendant's confessions to the offenses.

D

In a further argument related to prosecution witness Theodore Traylor, the defendant contends that trial counsel erred in opening the door to testimony by Traylor on redirect examination that he had been threatened by Antoine Moore. This information came to light in the following manner. During cross-examination, defense counsel asked Traylor whether he immediately reported the offenses to the police. Traylor responded that he did not notify the police, alluding to a threat and saying that he was “petrified and scared.” Later, on redirect examination, Traylor was asked about the source of the threat; according to Traylor, three days after the murder Antoine Moore told him, “Whoever say anything have the death penalty.” The trial judge overruled the defendant's objection to this testimony, explaining that defense counsel had opened the door to the information. The defendant now contends that trial counsel was ineffective for opening the door to the testimony about the threat.

We do not believe that trial counsel rendered ineffective assistance in opening the door to Traylor's testimony about the threat from Moore. As we have previously noted in this opinion, a defendant seeking to prevail on a claim of ineffective assistance of counsel must demonstrate both that counsel's performance was deficient and that prejudice ensued as a result of counsel's deficiency. 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). A court does not need to consider the first part of the 
Strickland
 test if the court is able to conclude, under the second part of the test, that counsel's actions were not prejudicial. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; 
People v. Burgess
, 176 Ill. 2d 289, 313 (1997).

Assuming that counsel was deficient in pursuing the inquiry that led to the testimony complained of here, we do not believe that the defendant sustained prejudice as a consequence of counsel's actions. As a preliminary matter, we note that the threat was uttered by Antoine Moore, not the defendant; it therefore demonstrated Moore's consciousness of guilt, not the defendant's. Moreover, we believe that the evidence of the defendant's guilt for these offenses was overwhelming. This evidence consisted of the eyewitness testimony of Theresa Barnes and Theodore Traylor, as well as of the defendant's two confessions to authorities. The defendant cannot show that there is a reasonable probability that the outcome of the trial would have been different if counsel had not undertaken the inquiry that led to the testimony about the threat.

E

In an additional argument directed at Theodore Traylor's testimony, the defendant asserts that the trial judge erred in refusing to instruct the jury on Traylor's testimony as an accomplice. At the conference on jury instructions defense counsel tendered a pattern accomplice instruction (see Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992)), but the trial judge declined to use it, concluding that Traylor could not be considered an accomplice under the evidence in this case. The defendant argues that an accomplice instruction was necessary here, and that the trial judge's refusal to give one was an abuse of discretion.

The refusal of an accomplice instruction will not be overturned on appeal unless it represents an abuse of discretion. We cannot say that the trial judge in the present case abused his discretion by refusing to give the defendant's tendered instruction. The appropriate test in determining the need for an accomplice instruction is whether there is probable cause to believe that the witness was guilty of the offense in question, either as a principal or, under a theory of accountability, as an accessory. 
People v. Henderson
, 142 Ill. 2d 258, 314-15 (1990). Summarizing the law in this area, the 
Henderson
 court explained:

“Thus, an accomplice-witness instruction should be given to a jury if the totality of the evidence and the reasonable inferences that can be drawn from the evidence establish probable cause to believe not merely that the person was present and failed to disapprove of the crime, but that he participated in the planning or commission of the crime; if probable cause is established the instruction should be given despite the witness' protestations that he did not so participate. [Citations.]” 
Henderson
, 142 Ill. 2d at 315.

The evidence in the present case does not support the conclusion that there was probable cause to believe that Traylor was guilty of the offenses involved here, as either a principal or an accessory. Theresa Barnes, an eyewitness to the shooting, did not see Traylor perform any act in relation to the commission of the crimes. Moreover, the defendant, in his statements to authorities, did not implicate Traylor in the crimes. According to the defendant's statements, Traylor did not join in the discussion of carjacking or the movie. Finally, Traylor's own testimony fails to show that the witness had any role in the commission of the crimes. Although Traylor was present in the car at the crime scene, it is well established that mere presence does not by itself render a person guilty of an offense. 
Henderson
, 142 Ill. 2d at 316. There was no probable cause in the present case to believe that Traylor was guilty of these offenses either as a principal or under an accountability theory, and therefore the trial judge did not abuse his discretion in refusing to give the jury an accomplice instruction for Traylor's testimony.

Finally, the defendant observes that Traylor at one point might have been charged with these offenses. Even if that was true, we do not believe that the placement of charges against him automatically determines his status as an accomplice. The relevant question under 
Henderson
 is not whether the witness was ever charged as a codefendant, but whether there is probable cause to believe that the witness is guilty of the offense at issue.

F

In his next challenge to the trial proceedings, the defendant argues that trial counsel was ineffective for failing to seek suppression of Theresa Barnes' identification of him in the lineup and to object to the admission of that testimony at trial. Noting Barnes' testimony that the defendant was the only person with long hair in the six-man lineup, the defendant argues that the composition of the lineup was unduly suggestive. The defendant raises the related contention that the loss by the police of photographs of the participants of the lineup denied him due process.

Under 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984), a defendant alleging ineffective assistance of counsel must show both a deficiency in counsel's performance and prejudice resulting from that deficiency. Prejudice in the context of the failure to seek suppression of evidence requires defendant to show that the unargued suppression motion was meritorious and that there is a reasonable probability that the verdict would have been different without the excludable evidence. See 
Kimmelman v. Morrison
, 477 U.S. 365, 375, 91 L. Ed. 2d 305, 319, 106 S. Ct. 2574, 2583 (1986); 
People v. Moore
, 171 Ill. 2d 74, 108 (1996). We need not determine here whether counsel was deficient in failing to seek suppression of Theresa Barnes' lineup identification, for we believe that the defendant cannot show prejudice by counsel's inaction. The evidence of the defendant's guilt in this case was overwhelming. Barnes could have testified at trial even if the lineup identification had been suppressed; it appears from Barnes' testimony at trial that her in-court identification of the defendant as the offender was not the product of the lineup procedures but instead was based on her observations at the time of the offenses. See 
People v. Enis
, 163 Ill. 2d 367, 398-99 (1994). Accordingly, invalidation of the lineup would not necessarily have resulted in the exclusion of Barnes' identification of the defendant as the shooter. But even without that witness' testimony, there would remain overwhelming evidence of the defendant's guilt. Theodore Traylor also provided an eyewitness account of the defendant's commission of the offenses, and the defendant gave authorities two inculpatory statements, in which he confessed his role in the crimes. On this record, then, we are unable to conclude that the defendant was prejudiced by counsel's failure to seek the suppression of the lineup identification, and the defendant's allegation of ineffective assistance therefore must fail.

In a related contention, the defendant argues that he was denied due process by the loss of photographs of the lineup, which depicted the six participants in the lineup. The defendant contends that the photographs could have bolstered his argument that the lineup was unfairly constituted. In 
Arizona v. Youngblood
, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), the Supreme Court held that “unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.” The defendant has not made that showing here. According to the testimony at trial, the photographs and report of the lineup could not later be retrieved from the records division of the police department and, it appears, were inadvertently lost. There is nothing to suggest here that the photographs and report of the defendant's lineup were treated differently than the records in any other case. Moreover, we have already determined that the defendant was not denied effective assistance of counsel by the failure to seek suppression of the lineup identification, and therefore we must also conclude that the loss of documentary evidence that might have supported a suppression motion had no significant impact on the defendant's case. See 
People v. Hobley
, 159 Ill. 2d 272, 307-08 (1994).

G

The defendant next argues that the trial judge erred in denying a motion he made to suppress his inculpatory statements. The defendant contends that the statements warranted suppression because they were made after he was illegally transferred from the Cook County jail and placed in the custody of the Chicago police department. Before this court, the defendant contends that the transfer occurred in violation of the Illinois Habeas Corpus Act. The defendant maintains that suppression of his two statements–the oral one he gave to the police officers, and the written one he later provided to the assistant State's Attorney–is an appropriate sanction for this statutory violation.

Before trial, the defendant filed a motion to suppress his confessions, alleging, among other grounds, that he was illegally taken from the Cook County jail to Area 2 headquarters for questioning in the present case. At the suppression hearing, police detectives Herman Cross and Paul Bernatek and Assistant State's Attorney Raymond Brogan testified that on June 15, 1993, Detective Bernatek obtained from Brogan what was termed a “jail letter” requesting that the director of the Cook County jail release the defendant into Bernatek's custody for 24 hours for a criminal investigation unrelated to any case then pending against the defendant. Brogan explained at the hearing that a jail letter is issued by a supervisor in the felony review unit when the requesting officer has satisfied the guideline that the investigation is unrelated to any pending case involving the inmate. Brogan also explained that a supervisor's approval is not necessary if the questioning is to occur on jail premises.

After Detectives Cross and Bernatek obtained the jail letter, they went to the intake unit of the county jail, where they were informed that the defendant was then in court. The detectives went to the specified courtroom and waited for the conclusion of the proceedings on the defendant's case, a probation violation, at which the defendant was represented by appointed counsel. The defendant was then taken back to the jail, and the detectives returned to the intake unit. The detectives presented the letter to personnel there and then removed the defendant from the jail and transported him to Area 2 headquarters. At Area 2, the defendant was placed in a lineup, and he later gave authorities two statements regarding his role in the present offenses. The detectives returned the defendant to the Cook County jail early the next morning. At the conclusion of the hearing, the trial judge denied the suppression motion. With respect to the issue raised here, the judge concluded that the means by which the detectives obtained custody of the defendant for their investigation did not implicate any constitutional rights. The judge also rejected the defendant's other grounds on which the defense sought to suppress the statements, including the defendant's allegation that he was physically mistreated while at Area 2.

Before this court, the defendant alleges that the procedure by which police obtained custody of him violated section 10–131 of the Illinois habeas corpus act. Section 10–131 provides:

“Any person being committed to any prison, or in the custody of any sheriff or other officer or person for any criminal or supposed criminal matter, shall not be removed therefrom into any other prison or custody, unless it is done by habeas corpus order or some other legal process or when it is expressly allowed by law.” 735 ILCS 5/10–131 (West 1994).

The defendant, in his reply brief, also cites section 4 of the County Jail Act, which requires the warden of a county jail to “confine in such jail, until discharged by due course of law, all persons committed to such jail by any competent authority.” 730 ILCS 125/4 (West 1994).

It should be noted that the defendant does not contend here that the questioning of him at Area 2 violated his fifth amendment right to counsel. The defendant's exercise of his sixth amendment right to counsel at the probation violation hearing did not extend to other, as yet uncharged, offenses and did not preclude, on fifth amendment grounds, questioning on unrelated offenses. 
McNeil v. Wisconsin
, 501 U.S. 171, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991); 
People v. Maxwell
, 148 Ill. 2d 116 (1992); 
People v. Kidd
, 147 Ill. 2d 510 (1992); 
People v. Perry
, 147 Ill. 2d 430 (1992).

Without deciding precisely what sort of protected interest the Habeas Corpus Act might give rise to (see 
Hewitt v. Helms
, 459 U.S. 460, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983)) and what sort of remedy is necessary for its violation, we do not believe that suppression is an appropriate consequence here. Neither the Habeas Corpus Act nor the County Jail Act is aimed at the sort of police misconduct that would warrant suppression of the defendant's statements. Indeed, we note that the statutorily prescribed penalty for a violation of section 10–131 of the Habeas Corpus Act is found in its concluding sentence, which provides, “If any person removes, or causes to be removed any prisoner so committed, except as above provided, he or she shall forfeit to the party affected a sum not exceeding $300.” 735 ILCS 5/10–131 (West 1994). Here, the trial judge rejected the defendant's allegations that he was mistreated while in police custody at Area 2 headquarters. Moreover, the police had legitimate reasons to transfer the defendant to Area 2, where the investigation was centered and where they could conduct a lineup.

H

In a final challenge to the conduct of the guilt-innocence proceedings, the defendant argues that the trial judge erred in sending to the jury room during the jury's deliberations a photograph of the victim at the crime scene. The defendant argues that the photograph in question, exhibit 15, is gruesome and duplicative of another exhibit, number 18, which was also sent to the jury for its deliberations.

At trial, the prosecution must prove every element of the offense charged and is allowed to establish every relevant fact, even if the matter is not in dispute. 
People v. Henderson
, 142 Ill. 2d 258, 319 (1990). In a prosecution for murder, photographs may be admitted into evidence to show the nature and extent of the victim's injuries, the condition or location of the victim's body at the crime scene, or the manner or cause of the victim's death, among other purposes. 
People v. Kidd
, 175 Ill. 2d 1, 37 (1996). Whether to send a jury photographs depicting a victim's injuries is reserved to the trial judge's discretion, and the decision will not be reversed unless it represents an abuse of discretion. 
People v. Lucas
, 132 Ill. 2d 399, 439 (1989).

We do not believe that the trial judge in the present case abused his discretion in allowing the challenged photograph to go to the jury room. Exhibit 15, challenged by the defendant, depicts at close range the position of the victim in his car. Exhibit 18, in contrast, is a photograph of the entire front seat area of the vehicle; it shows the location of a bullet on the passenger's side, next to the victim, who is also visible in the photograph. The two exhibits were used for distinct purposes and are not unnecessarily duplicative. We believe that both photographs would have assisted the jurors in understanding the testimony at trial, and that the probative value of the challenged exhibit was sufficient to outweigh any prejudicial effect it might have produced.

II

A

The defendant also challenges on several grounds the capital sentencing hearing conducted in this case. The defendant first makes two related arguments regarding the eligibility stage of the sentencing hearing. The defendant contends that the State failed to establish the existence of any particular statutory aggravating circumstance, and that trial counsel was ineffective for stipulating to the defendant's eligibility for the death penalty. Neither contention has merit.

The first stage of the sentencing hearing was brief and consisted of the following:

“[Prosecutor]: As far as eligibility, we will first introduce into the record a certified birth certificate of David Harris showing that he was over eighteen at the time of the offense, as People's Exhibit No. 2.

We would enter into evidence the signed jury verdict forms for the intentional and knowing murder and also for the attempt armed robbery. I just ask that that be admitted into evidence as People's No. 2.

[Defense counsel]: I'll stipulate to eligibility also, judge.

THE COURT: All right, there will be a finding by this Court of eligibility, under the statute.”

The sentencing hearing then advanced to the second stage, and the parties presented evidence in aggravation and mitigation.

The defendant argues that the eligibility proceedings were defective because, he contends, the State failed to allege, and the trial judge failed to find beyond a reasonable doubt, the existence of any specific statutory aggravating circumstance that would render him eligible for the death penalty. The defendant also asserts that trial counsel was ineffective for stipulating to his eligibility for the death penalty.

We believe that the State established the existence of the aggravating circumstance defined by section 9–1(b)(6) of the Criminal Code of 1961, the commission of first degree murder in the course of a specified felony, here attempted armed robbery. 720 ILCS 5/9–1(b)(6) (West 1994). Although the State did not specifically cite section 9–1(b)(6) either in its written motion for a capital sentencing hearing or in court during the first stage of the hearing, the record shows clearly that section 9–1(b)(6) served as the basis for the eligibility determination. At the hearing, the prosecutor referred to the defendant's convictions for first degree murder and attempted armed robbery, which together would be sufficient to establish eligibility for the death penalty under section 9–1(b)(6). In addition, the judgment order entered the next day by the judge cites section 9–1(b)(6) as the basis for the eligibility determination.

Moreover, we conclude that the proceedings adequately established the defendant's eligibility for the death penalty under section 9–1(b)(6). The State introduced into evidence the defendant's birth certificate, establishing that he had reached the age of 18 at the time of the murder (720 ILCS 5/9–1(b) (West 1994)), and the defendant's convictions in this case for first degree murder and attempted armed robbery. This information was sufficient to establish, beyond a reasonable doubt, the existence of the aggravating circumstance found in section 9–1(b)(6). 
People v. Shatner
, 174 Ill. 2d 133, 149 (1996).

The defendant also contends that trial counsel was ineffective for stipulating to his eligibility for the death penalty. In making this argument the defendant contends that the appropriate standard for assessing counsel's conduct is provided by 
United States v. Cronic
, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), and 
People v. Hattery
, 109 Ill. 2d 449 (1985). The defendant notes further that his consent to counsel's stipulation appears nowhere in the record. Unlike the two-part test expressed in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), which requires a defendant to establish both a deficiency in counsel's performance and prejudice resulting from the asserted deficiency, 
Cronic
 requires a court to presume that counsel's error, if established, was prejudicial. The presumption is properly invoked when, for example, the adversarial process breaks down, when counsel is no longer functioning as a true advocate, and a court is warranted in concluding, without further inquiry, that the defendant incurred prejudice as a consequence of counsel's conduct. 
Cronic
, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047; 
Strickland
, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067. This court applied the 
Cronic
 standard in 
Hattery
, in which defense counsel conceded in opening statement his client's guilt to murder charges, did not introduce any evidence at trial, and did not make a closing argument to the jury.

We believe that 
Strickland
, not 
Cronic
 and 
Hattery
, supplies the appropriate standard for assessing trial counsel's performance at the first stage of the sentencing hearing. In 
People v. Smith
, 176 Ill. 2d 217 (1997), this court concluded that 
Strickland
 provided the proper test for assessing a similar claim of ineffective assistance of counsel. Like defense counsel in the present case, counsel in 
Smith
 had contested the defendant's guilt at trial; at the first stage of the sentencing hearing, “counsel merely conceded the undisputed fact of defendant's murder and felony convictions.” 
Smith
, 176 Ill. 2d at 231. Following a remand for a new sentencing hearing, counsel in 
Smith
 mistakenly believed that the defendant's eligibility for the death penalty was not at issue and therefore failed to contest the evidence presented by the prosecution at that stage of the proceeding on remand.

In determining, under 
Strickland
, whether counsel's performance at a capital sentencing hearing was prejudicial to the defendant, a court must ask whether there is a reasonable likelihood that the result of the hearing would have been different. We do not believe that the eligibility determination would have been different if counsel had challenged the State's evidence. The verdicts returned by the jury clearly established the defendant's commission of the murder in the course of attempted armed robbery. These were certainly sufficient also to establish the defendant's eligibility for the death penalty under section 9–1(b)(6).

B

The defendant next argues that one of the victim impact statements introduced into evidence at the second stage of the sentencing hearing improperly urged the trial judge to impose the death penalty. The defendant argues that introduction of this portion of the statement denied him a fair sentencing hearing.

The evidence in question was presented as part of the victim impact statement of Olivia Chase, one of the victim's two daughters. Reading from her statement at the second stage of the sentencing hearing, Olivia Chase concluded:

“Clifford Chase's murderer has been apprehended, tried, convicted and must now face punishment for his cowardly despicable act. An act, which in most societies, ancient or modern, carries with it the ultimate punishment.”

The defendant characterizes the preceding comments as a recommendation that the death penalty should be imposed in this case. The defendant argues that the comments therefore violated the proscription against witness' views regarding punishment. In response, the State contends that the daughter's comments are not a plea for capital punishment but simply an observation about the potential sentence that faced the defendant.

In 
People v. Howard
, 147 Ill. 2d 103, 155-58 (1991), this court adopted the view expressed by United States Supreme Court in 
Payne v. Tennessee
, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), permitting the State to present victim impact evidence in a capital sentencing hearing. To that extent 
Payne
 overruled decisions to the contrary in 
Booth v. Maryland
, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987), and 
South Carolina v. Gathers
, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989). 
Payne
 did address, however, the prohibition in 
Booth
 on the introduction of surviving family members' views regarding appropriate punishment. 
People v. Scott
, 148 Ill. 2d 479, 553 (1992); 
Howard
, 147 Ill. 2d at 157. We note that this court has held that witnesses' opinions regarding the proper punishment in a capital case are irrelevant and therefore inadmissible at a capital sentencing hearing. 
People v. Stewart
, 105 Ill. 2d 22, 67 (1984).

Defense counsel did not make a contemporaneous objection to the daughter's testimony or raise the issue in the defendant's post-sentencing motion. Accordingly, the issue has been waived. In light of that procedural default, the defendant makes the twin arguments that introduction of the evidence was plain error and that trial counsel was ineffective in failing to object to the testimony. Neither contention is persuasive.

We do not believe that the defendant would have escaped the death penalty if the challenged portion of the victim impact statement had been excluded from evidence. The defendant's sentencing hearing was conducted before the trial judge alone, the defendant having elected to waive a jury for that purpose. A trial judge is deemed to consider only admissible evidence (see 
People v. Evans
, 125 Ill. 2d 50, 95-96 (1988) (trial judge at bench sentencing hearing presumed not to rely on counsel's improper argument)), and we will not suppose that the judge gave improper weight to Olivia Chase's statement in deciding to sentence the defendant to death. The trial judge, in announcing his decision to impose the death penalty in this case, did not refer to the witness' victim impact statement. The evidence presented at the sentencing hearing was not closely balanced, and we do not believe that this brief portion of the statement had any bearing on the trial judge's sentencing decision.

C

The defendant next argues that trial counsel was ineffective for not introducing additional mitigating evidence at the second stage of the sentencing hearing. Defense counsel did not present any testimony at that stage of the hearing, but counsel did submit 17 letters from relatives and friends of the defendant, who wrote about him favorably.

Counsel's failure to present mitigating evidence does not automatically establish ineffective assistance. 
People v. Perez
, 148 Ill. 2d 168, 186 (1992). Rather, in evaluating similar allegations of lawyer incompetence, we have previously applied the two-part test announced in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1986). 
E.g.
, 
People v. Todd
, 178 Ill. 2d 297, 324 (1997); 
People v. Howery
, 178 Ill. 2d 1, 55 (1997); 
People v. Madej
, 177 Ill. 2d 116, 135 (1997); 
People v. Sanchez
, 169 Ill. 2d 472, 486-87 (1996); 
People v. Perez
, 148 Ill. 2d at 186. As we have noted, for success on a claim of ineffective assistance, 
Strickland
 requires a defendant to establish both that counsel's performance was deficient and that the deficiency was prejudicial. 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Prejudice in the context of a capital sentencing hearing requires a defendant to show that there is a reasonable probability that he would not have received the death sentence if counsel had acted competently. 
Strickland
, 466 U.S. at 694-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2068-69.

The defendant maintains that many of the letters submitted in his behalf at the second stage of the sentencing hearing were of questionable or limited relevance, because those writers unhelpfully focused on the jury's verdicts, insisting that the defendant was innocent of the charges here, and failed to discuss the defendant's attributes as an individual. The defendant accurately observes that the purpose of a capital sentencing hearing is to provide an individualized assessment of the defendant and his offense (
Sumner v. Shuman
, 483 U.S. 66, 73-76, 97 L. Ed. 2d 56, 64-66, 107 S. Ct. 2716, 2721-23 (1987); 
Woodson v. North Carolina
, 428 U.S. 280, 303-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2990-91 (1976) (plurality opinion); 
People v. Ruiz
, 132 Ill. 2d 1, 25 (1989)), and not to raise doubt about the preceding determination of guilt.

The defendant notes also that trial counsel, Dennis Doherty, asserted in the post-sentencing motion that his representation of the defendant at the sentencing hearing was ineffective. Doherty stated in the motion:

“Defendant should be afforded a new sentencing hearing with new counsel, inasmuch as defendant was denied effective assistance of counsel at sentencing, where counsel did not present any evidence or witnesses in mitigation, nor investigate the existence of same, even though same exists.”

Doherty's concession of his ineffective assistance is not dispositive here. Addressing a similar statement made by trial counsel about his performance at the second stage of a capital sentencing hearing, we recently explained, “Counsel's own admission of ineffectiveness is not binding on us or determinative of the issues raised here. [Citation.]” 
People v. Sanchez
, 169 Ill. 2d 472, 490 (1996). Doherty's concession might be a basis for disciplinary action either for his performance during the trial proceedings or for the allegation concerning that performance in the motion; it does not by itself, however, establish either substandard performance or prejudice, the two parts of the 
Strickland
 test, as we explain below.

In a number of cases this court has addressed similar allegations regarding counsel's failure to present mitigating evidence at a capital sentencing hearing. See, 
e.g.
, 
People v. Todd
, 178 Ill. 2d 297, 320-28 (1997); 
People v. Howery
, 178 Ill. 2d 1, 54-62 (1997); 
People v. Madej
, 177 Ill. 2d 116, 127-40 (1997); 
People v. Sanchez
, 169 Ill. 2d 472, 488-92 (1996); 
People v. Perez
, 148 Ill. 2d 168, 187-96 (1992). As an examination of those cases reveals, resolution of the claim will depend on the nature and extent of the information available to counsel but not introduced into evidence, as well as on the strength of the aggravating evidence presented by the prosecution. In addition, the cases recognize that deference must be accorded to strategic decisions made by counsel after suitable investigation.

Unlike the records in 
Howery
 and 
Perez
, cases in which counsel was found to be ineffective for failing to investigate and present available mitigating evidence, the record in the present case does not disclose what other mitigating evidence trial counsel could have introduced. 
Perez
 was a post-conviction proceeding; at a hearing on the defendant's petition, post-conviction counsel presented extensive evidence regarding the defendant's personal background and mental history–evidence that trial counsel had neglected to introduce at sentencing. In 
Howery
, a direct appeal, new counsel at a post-sentencing hearing presented evidence of the defendant's civic involvement, which trial counsel had failed to introduce. In the present case, however, the defendant has made no showing of what additional mitigating evidence was available to trial counsel at the time of the sentencing hearing. Therefore, we are unable to conclude, under 
Strickland
, that counsel was deficient in failing to present additional mitigation and, further, that introduction of additional mitigating evidence would have altered the outcome of the sentencing hearing. As we have noted, counsel's failure to present mitigating evidence at a capital sentencing hearing does not by itself establish incompetence. Without a showing of what further evidence was available to trial counsel at the time of the hearing, we are unable to determine whether counsel's conduct fell below minimal professional standards or whether the defendant incurred prejudice as a consequence of counsel's inaction.

D

As a final matter, the defendant raises a number of challenges to the constitutionality of the Illinois death penalty statute, section 9–1 of the Criminal Code of 1961 (720 ILCS 5/9–1 (West 1994). The defendant contends first that the statute places on the defense a burden of proof that prevents the sentencer from giving meaningful consideration to evidence in mitigation. The defendant refers to the requirement in the statute that the death penalty be imposed unless there is mitigating evidence sufficient to preclude its imposition. 720 ILCS 5/9–1(g), (h) (West 1994). We have previously rejected this argument, concluding that it “rests on a strained interpretation of the statutory language” (
People v. Strickland
, 154 Ill. 2d 489, 539 (1992)), and we find no reason to reach a different result here. 
People v. Page
, 155 Ill. 2d 232, 283 (1993); 
People v. Hampton
, 149 Ill. 2d 71, 116-17 (1992).

The defendant also contends that a number of features of the sentencing scheme do not sufficiently minimize the risk that a death sentence will be imposed in an arbitrary and capricious manner. Our cases have consistently found these procedures to be constitutional, however, and we do not believe that their combined effect impairs the validity of the statute. Thus, our cases have held that the statute is not invalid for the discretion it provides the prosecutor in deciding whether to seek the death penalty in a particular case. 
People v. Lewis
, 88 Ill. 2d 129, 146 (1981); 
People ex rel. Carey v. Cousins
, 77 Ill. 2d 531, 534-43 (1979). Our cases have also held that the statute is not invalid for failing to require the prosecution to give the defense pretrial notice of its intent to seek a sentence of death. 
People v. Silagy
, 101 Ill. 2d 147, 161-62 (1984); 
People v. Gaines
, 88 Ill. 2d 342, 369 (1981). We have determined that the statute is not invalid for failing to limit aggravating evidence to matters specified in its provisions (
People v. Young
, 128 Ill. 2d 1, 59 (1989); 
People v. Orange
, 121 Ill. 2d 364, 390-91 (1988); 
People v. Perez
, 108 Ill. 2d 70, 97-98 (1985)), or to matters disclosed to the defense prior to trial (
People v. King
, 109 Ill. 2d 514, 547 (1986); 
People v. Albanese
, 104 Ill. 2d 504, 540 (1984); 
Gaines
, 88 Ill. 2d at 369). The death penalty statute is not invalid for failing to impose a burden of persuasion on the prosecution at the second stage of the hearing (
People v. Jones
, 123 Ill. 2d 387, 426 (1988); 
People v. Eddmonds
, 101 Ill. 2d 44, 68 (1984); 
People v. Free
, 94 Ill. 2d 378, 421 (1983)), and it does not invalidly place on the defense a burden of establishing that a noncapital sentence should be imposed (
People v. Fields
, 135 Ill. 2d 18, 76 (1990); 
Orange
, 121 Ill. 2d at 390; 
People v. Caballero
, 102 Ill. 2d 23, 49 (1984)). We have also held that the statute is not invalid for failing to require the sentencer to provide a written memorial of its findings. 
King
, 109 Ill. 2d at 550-51; 
People v. Stewart
, 104 Ill. 2d 463, 497 (1984); 
People v. Brownell
, 79 Ill. 2d 508, 541-44 (1980). Although the defendant's sentencing hearing was a bench proceeding, we note, contrary to the defendant's contention, that there is no requirement that a sentencing jury be apprised of the precise range of sentences that are available if a defendant does not receive the death penalty. 
People v. Phillips
, 127 Ill. 2d 499, 543 (1989); 
People v. Albanese
, 102 Ill. 2d 54, 81 (1984). Finally, comparative proportionality review is not a requirement of the United States Constitution (
Pulley v. Harris
, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984)), and the statute is not invalid for failing to require such review (
King
, 109 Ill. 2d at 551; 
Stewart
, 104 Ill. 2d at 499; 
People v. Kubat
, 94 Ill. 2d 437, 502-04 (1983)). In light of the extensive authority upholding these features of the death penalty statute, we must reject the defendant's argument that in combination they threaten its arbitrary and capricious imposition. 
People v. Burgess
, 176 Ill. 2d 289, 323 (1997); 
People v. Pitsonbarger
, 142 Ill. 2d 353, 409 (1990).

* * *

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Thursday, September 15, 1998, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119–5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

Judgment affirmed.

CHIEF JUSTICE FREEMAN, specially concurring,

I agree with my colleagues that the judgment of the circuit court must be affirmed in all respects. I write separately, however, to add several observations to the majority's analysis concerning defendant's claim regarding his attorney's decision to stipulate to defendant's death eligibility during the sentencing phase of the proceedings.

The majority correctly reviews defendant's claim under the familiar standards enunciated by the United States Supreme Court in 
Strickland v. Washington
. See 
People v. Smith
, 176 Ill. 2d 217 (1997) (rejecting the 
Cronic-Hattery
 standard and employing the 
Strickland 
standard where defense counsel did not contest defendant's eligibility for the death penalty). After applying the 
Strickland
 analysis to the instant facts, my colleagues rightly conclude that defendant cannot establish the requisite prejudice in this case because the eligibility determination would not have been different had counsel challenged the State's evidence. Slip op. at 28-29. The majority reaches this conclusion solely on the basis that “[t]he verdicts returned by the jury clearly established the defendant's commission of the murder in the course of attempted armed robbery. These were certainly sufficient also to establish defendant's eligibility for the death penalty under section 9–1(b)(6).” Slip op. at 29.

Although I agree with my colleagues that the jury's verdicts play a substantial role in our analysis, I do not agree that their existence 
alone
 compels the conclusion that defendant cannot establish prejudice. Section 9–1(b)(6) requires defendant to have intended to kill the victim or to have known that his actions created a probability of death or great bodily harm. The trial verdicts alone, of course, do not establish this beyond a reasonable doubt in the context of the sentencing hearing. I note that the jury here returned only a general verdict of guilty with respect to first degree murder based on theories of intentional, knowing, and felony murder. Therefore, we do not know 
beyond a reasonable doubt
 that the jury agreed unanimously on the question of defendant's 
mens rea
. Nevertheless, the jury's verdicts, when viewed in conjunction with all of the evidence adduced at the trial 
which the trial judge heard
, form the basis for affirming the 
trial judge's
 specific finding of death eligibility on appeal. I reach this conclusion because several legal presumptions arise when, as in this case, the trial judge, and not a jury, serves as the trier of fact during the sentencing hearing. See 
People v. Johnson
, 149 Ill. 2d 118 (1992). One such presumption is that the trial judge knows and follows the law. 
People v. Woolley
, 178 Ill. 2d 175 (1997). We may presume, therefore, that the trial judge knew of the specific elements required under section 9–1(b)(6) for a finding of death eligibility. Moreover, the judge, as the trier of fact, may infer the intent to take a life from a defendant's acts and the circumstances surrounding the commission of the offense. 
People v. Garcia
, 97 Ill. 2d 58, 85 (1983). As a result, this court can uphold the trial judge's eligibility finding on appeal because a review of the evidence adduced at trial clearly establishes that any argument that defense counsel would have made regarding eligibility under section 9–1(b)(6) would have been refuted. Each of these factors, taken as a whole, compel the conclusion that the trial judge found the statutory factor to have been proved beyond a reasonable doubt and that defendant was not prejudiced in any way by counsel's alleged ineffectiveness.

By limiting its analysis to only the jury's general verdicts and omitting any discussion of the trial judge's role as the trier of fact at this sentencing hearing, the majority seemingly holds that those verdicts 
alone
 serve to fulfill the elements of section 9–1(b)(6) beyond a reasonable doubt and, in turn, operate to defeat defendant's claims of prejudice for purposes of 
Strickland
. However, in cases where defense counsel has failed to subject the prosecution's case to meaningful adversarial testing at the eligibility stage of sentencing, this court has, at least until today, relied equally upon both the jury's guilt phase verdicts 
and
 the evidence of intent adduced at trial and heard by the trial judge. 
See 
Smith
, 176 Ill. 2d at 232-33; 
People v. Shatner
, 174 Ill. 2d 133, 151 (1996) (recognizing, in both cases, that the sentencing judge heard the evidence which on appeal was held to establish the requisite 
mens rea
 for a finding of death eligibility and to preclude a finding of prejudice). Consistent with this precedent, I believe that a more reasoned analysis in this case would likewise take into consideration the evidence heard by the trial judge during the course of the guilt phase of the proceedings, as it is this evidence which (i) actually supports the trial judge's specific finding of eligibility made at sentencing and (ii) defeats defendant's appellate assertions of prejudice.

In all other respects, I join in the majority's opinion.

JUSTICE McMORROW, concurring in part and dissenting in part:

I join in the majority's affirmance of the defendant's conviction. However, I dissent from the majority's affirmance of defendant's death sentence, because I believe that the facts of this case and our factual knowledge of this defendant simply do not warrant imposition of the death penalty.

It is this court's “responsibility in every death penalty case to carefully consider the character of the defendant and the circumstances of his crime before we sanction the termination of his life.” 
People v. Tye
, 141 Ill. 2d 1, 37 (1990) (Ryan, J., concurring in part and dissenting in part). In fulfilling this responsibility, we are “guided by the recognition that `each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.' [Citation.]” 
People v. Smith
, 177 Ill. 2d 53, 98 (1997). It is this court's duty to vacate a death sentence “where such an extreme penalty [is] found to be inappropriate, in light of any relevant mitigating factors.” 
Smith
, 177 Ill. 2d at 98, citing 
People v. Blackwell, 
171 Ill. 2d 338 (1996);
 People v. Leger
, 149 Ill. 2d 355 (1992); 
People v. Buggs
, 112 Ill. 2d 284 (1986); 
People v. Carlson
, 79 Ill. 2d 564 (1980).

After careful consideration, I conclude that the facts of this crime do not mandate imposing the death penalty. Anytime a human being unjustifiably takes the life of another, a civilized society should be horrified. “[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct.” 
Gregg v. Georgia
, 428 U.S. 153, 183, 49 L. Ed. 2d 859, 880, 96 S. Ct. 2909, 2930 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Nevertheless, our society and laws do not sanction the death penalty for 
all 
crimes which may shock a civilized society. Instead, we reserve it for those “crimes [which] are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.” 
Gregg
, 428 U.S. at 184, 49 L. Ed. 2d at 881, 96 S. Ct. at 2930 (opinion of Stewart, Powell, and Stevens, JJ.).

The mechanism by which we narrow the universe of convicted murderers to those who are eligible for the death penalty is contained in the group of statutory aggravating factors. One of those aggravating factors is the commission of a murder in the course of another felony. There is no dispute that defendant in this case falls within the broad sweep of the felony murder aggravating factor. However, the felony murder aggravating factor has swept too far in the case at bar, because defendant's crime does not fall within that special class of murder cases which so shock the conscience of a society that execution of defendant is “the 
only 
adequate response.”

Like most, or perhaps all murders, this murder was senseless, tragic, and unnecessary. However, the murder was not notably brutal or heinous. The victim was not beaten or tortured. There was no evidence that he suffered prior to his death. It appears that the victim died almost immediately after he was shot. The murder was not the product of premeditation or planning. It was a single murder, not part of any murderous spree. The murder was an act of aberrant behavior occasioned by defendant complying with a cohort's direction to the defendant to shoot the victim. For these reasons, I do not believe that the circumstances of this crime are such that the imposition of the death penalty is “the 
only 
adequate response.”

In addition, there is little in defendant's character and background which indicates that the ultimate sanction of death is appropriate. The aggravating evidence introduced by the State consisted of victim impact statements by the victim's surviving relatives; evidence that defendant had committed two other carjackings in the four days preceding the murder; evidence that defendant had been involved in two small drug transactions in 1992; evidence that defendant had committed several rules infractions while incarcerated for the murder; evidence that defendant had not exhibited remorse after the murders; and evidence that defendant was a member of a street gang.

The aggravation evidence does not definitively or adequately demonstrate that defendant is a person “with a malignant heart who must be permanently eliminated from society.” 
People v. Carlson
, 79 Ill. 2d 564, 590 (1980). The only violent crimes included in the aggravation evidence were two armed carjackings by defendant. No one was injured in either of those carjackings. One of these incidents occurred four days before the murder of Clifford Chase, the other occurred two days before the murder. 

The origin of defendant's apparently sudden interest in carjacking is not a mystery: the majority notes that defendant and his cohorts had recently seen a film about carjacking. The sequence of events here is clear. Defendant and his young friends saw a film which glamorized carjacking. They talked about carjacking on more than one occasion. While committing the carjacking in this case, one of defendant's companions encountered the noncompliant victim, and told defendant to shoot the victim. Defendant complied. This sequence of events shows that defendant was not only violent, but also that he was susceptible to a cohort's influence, that he was immature, impressionable, and reckless. It does not show that defendant is a hardened criminal. The death penalty should be reserved for the most dangerous and incorrigible criminals–the “worst” criminals. Foolishness, susceptibility to peer influence, immaturity, impressionability, and recklessness by an 18-year-old, taken individually or collectively, should not render a defendant one of society's “worst” criminals, for whom the death penalty is appropriate. The deterrent and retributive purposes of the death penalty are not served by its imposition in this case.

Defendant's youth is a particularly important consideration in this case. The United States Supreme Court has held that a defendant's youth is an important consideration in determining whether sentencing him to death would serve the deterrent and retributive purposes of the death penalty. “[Y]outh must be considered a relevant mitigating factor. *** [It] is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence ***.” 
Eddings v. Oklahoma
, 455 U.S. 104, 115, 71 L. Ed. 2d 1, 11, 102 S. Ct. 869, 877 (1982). The Court elsewhere has noted that a younger defendant is less able to control his conduct and appreciate the consequences of that conduct than is an older defendant, and that, for this reason, youth is a “special mitigating force.” 
Thompson v. Oklahoma
, 487 U.S. 815, 834-35, 101 L. Ed. 2d 702, 718-19, 108 S. Ct. 2687, 2698-99 (1988) (plurality opinion). Defendant was 18 years and 8 months old at the time of the offense. The death penalty statute provides that a defendant must be 18 years old in order to be eligible for the death penalty. See 720 ILCS 5/9–1(b) (West 1994). Thus, defendant was eligible for the death penalty by being only 8 months older than the statutory eligibility age.

I do not deprecate or minimize the loss defendant has inflicted on the family and friends of Clifford Chase. Indeed, the egregiousness of defendant's conduct is accentuated by the fact that defendant has shown little or no remorse since the murder, and that the victim was 71 years of age and totally innocent. But the pain caused by this senseless murder will not be mitigated or alleviated by taking defendant's life for an impulsive act he committed when he was 18 years old, and which he committed at the instigation of a friend after seeing a film glamorizing carjacking. The deterrence and retributive functions owed society would be served in the facts of this case if defendant were imprisoned for the rest of his natural life.

All murders are tragic; all murderers deserve societal reprobation and retribution. This case is no exception. However, as previously stated, the death penalty is not sanctioned as appropriate for all murders. The circumstances of a given crime and the character of a given offender are to be examined, and the death penalty is to be reserved for the “worst” murders and the most hardened and depraved murderers. Neither this crime nor this defendant falls within these categories. For this reason, I dissent from the majority's affirmance of the death sentence.

I also write separately for another reason. The majority concludes that defendant's claim of ineffective assistance of counsel, because of defense counsel's failure to offer any mitigation evidence and counsel's admitted failure to investigate the existence of mitigation evidence, must fail. My colleagues' conclusion is based on the fact that, in this appeal, defendant has not shown that there existed any mitigation evidence which defense counsel 
could have
 introduced 
if 
he had conducted an investigation. Thus, the majority concludes, defendant has not shown prejudice as a result of the failure to investigate, and, under 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), defendant is unable to prevail on a claim of ineffective assistance of counsel. The majority's conclusion is correct if the 
Strickland 
standard is applied strictly.

This court has a duty to ensure that only those who are most deserving of the death penalty actually receive that sentence. This task is made difficult when defense counsel offers no mitigation evidence whatsoever. Ordinarily, we would be justified in assuming that no mitigating evidence was introduced either because counsel investigated whether such evidence existed and found none, or because he made a strategic decision not to offer the evidence. However, in cases where the defense counsel admits that he made 
no 
investigation to determine if mitigation evidence existed, the picture of defendant which has been presented to this court may be incomplete. We do not know whether this lack of evidence is a result of the fact that none existed or the fact that counsel simply did not know of any mitigating evidence because of his failure to investigate. In such cases, it is extremely difficult to fulfill our constitutional duty and make an informed decision as to whether this defendant is a person “with a malignant heart who must be permanently eliminated from society.” 
Carlson
, 79 Ill. 2d at 590.

In view of the fact that the ultimate and irreversible sanction has been imposed on defendant, I would remand this case for a new sentencing hearing. In the alternative, based on the facts of this murder, I would vacate defendant's death sentence and sentence him to imprisonment for his natural life.